# EXHIBIT

# Q

# GHERARDI V. CITIGROUP GLOBAL MARKETS INC., ET AL.

# FINRA DR CASE ID NO. 16-01001

# CLAIMANT'S POST-HEARING BRIEF

## SUBMITTED BY
## LAW OFFICE OF ETHAN A. BRECHER, LLC
## 600 3RD AVENUE, 2ND FLOOR
## NEW YORK, NY 10016
## (T) 646-571-2440
## ETHAN@ETHANBRECHERLAW.COM

## **PRELIMINARY STATEMENT**

Christian Gherardi ("Gherardi") had an exemplary 20-year career at Citigroup Global Markets, Inc. ("Citi") and was the top producing broker in his division in Miami.  His success made him a target for less accomplished brokers, and he was required to navigate repeated, improper and unpunished poaching of his clients by other brokers throughout his employment, even though Citi had a policy or practice of banning poaching.

Significantly, Gherardi's book of business was viewed by management as especially well-run and clean from a compliance perspective.   By contrast, Citi's lack of compliance controls and failure to address anti-money laundering problems in other areas of the bank led on October 2, 2015 to a government-imposed, franchise-threatening moratorium barring brokers from opening new accounts and expanding their business.  The moratorium had the potential to derail Gherardi's career by making it impossible for him to expand his business.  The moratorium also precluded Citi from hiring new brokers who could bring in new business.  Citi's management immediately recognized that the moratorium would cause its best brokers to leave and join competitors. Marcelo Coscarelli ("Coscarelli"), who was head of Citi's Latin American business in 2015, testified that he was concerned that "competitors could take advantage of the [moratorium] situation and cast Citi in the negative light and make the case that people are better off going to another institution." (H'rg Tr.,11/16/17, 85:2-7)   Gherardi's manager Michael Averett ("Averett") was particularly concerned that Gherardi would leave because he was the top producing broker under his supervision and, as Averett  admitted, a "huge part of [his] P&L."

With the moratorium in place, Gherardi became less valuable to Citi as he could no longer bring in new clients. Citi could make more money redistributing his accounts (which generated fees through quarterly commissions from mutual funds as opposed to trading) to brokers paid at much lower commission levels. This would also accomplish the goal of retaining the lower performing brokers who

were also adversely affected by the moratorium and who were at risk of leaving Citi due to the impact of the moratorium.

Thus, Citi was confronted with the choice of losing Gherardi and his clients to the competition, neither of which could be replaced with the moratorium in effect, or firing him and blocking him from taking clients to the competition. Citi chose the latter option.

In order to preempt Gherardi's voluntary departure, which would undermine Citi's ability to retain his 500-600 client relationships that generated $2 million gross commissions annually, Citi's weak and ineffective managers justified his firing to the firm's disciplinary committee, which was required to approve his termination, by relying on rank, unsubstantiated and prejudicial rumors of a personal nature and describing falsely "incidents" between Gherardi and two brokers who had tried to poach his clients.

Citi cited the "incidents" on Gherardi's U-5 Form to disparage him so that no other competitor firm would hire him, thereby blocking him from taking the business Citi now valued more than ever. Averett's human resources contact Maria Vasquez ("Vasquez") bolstered Averett's recommendation to fire Gherardi by poisoning the disciplinary committee with lies and innuendos relating to non-work issues, including allegations of domestic violence, gun ownership and menacing behavior on an airplane. Averett also informed the disciplinary committee that he was "scared" of Gherardi, which as one of the members of the disciplinary committee (Antonio Guerrero) testified helped explain why Averett was pressing for Gherardi's termination. At trial Averett denied telling the disciplinary committee he was afraid of Gherardi or that he was ever afraid of Gherardi.

Averett and Vasquez colluded in their presentation to the disciplinary committee to dehumanize Gherardi through lies and distortions about him and his interactions with others. They made it appear as if Gherardi, despite being an otherwise exemplary employee who also was under extreme stress with a disabled child in need of extensive and expensive medical care, was a ticking time-bomb who might at

any time snap and commit a violent act against his colleagues.  This false and distorted picture of Gherardi was intended to manipulate the disciplinary committee into rubber-stamping his firing.

The "business decorum incidents" in question were pretexts (i.e. lies) to support the firing and cover up the real motivation for firing him, which was to harm Gherardi and block him from taking clients after leaving the firm.

The first of the "incidents" was captured on a security video, which showed that nothing improper happened when Gherardi spoke in a building lobby with a Citi broker named Rodrigo Motta ("Motta"), who had repeatedly tried to poach Gherardi's clients.  Not surprisingly, Citi elected not to call Motta and subject him to cross-examination about the "incident," which he complained about before knowing it was recorded on video.

As for the second "incident," the client at issue (Jose Freitas ("Freitas")), who Citi alleges Gherardi berated on the phone after calling to alert him to a potential fraudulent transaction in his account, invested $200,000 with Gherardi a few weeks after the alleged misconduct.  Citi has taken the absurd and illogical position that Freitas was so scared of Gherardi that he felt compelled to invest with him.  Freitas, however, testified that Gherardi always treated him professionally, and that he would never have invested with him had he been mistreated.  Freitas further testified that he told the same thing to Gherardi's sales manager Eligio Peraza ("Peraza"), who Citi also chose not to call at trial and expose to cross-examination.

The other broker in this  "incident," Jorge Menendez ("Menendez"), recanted at trial many of the allegations he made against Gherardi in an email he sent immediately after the "incident" happened.  He admitted that, contrary to what he wrote, he had no first-hand knowledge of Gherardi's interaction with Freitas.  He also admitted that he used a wrong "adjective" in his email to describe how Gherardi spoke to him, downgrading it from "screaming" to being spoken to in what he perceived to be a loud and condescending manner, which "pissed" him off. With his multiple versions of events it is impossible to

know if anything Menendez says is truthful, but the one thing that is certain is that almost nothing that he wrote in his email about the "incident" was truthful.

Averett also lied to Coscarelli about what happened in this "incident," telling him falsely that Gherardi had threatened and cursed at Menendez, thereby making Gherardi's interaction with Menendez appear extreme and inappropriate.

The disciplinary committee's decision approving the termination was corrupted by the unfounded personal rumors and insinuations that it heard from Averett and Vasquez. Citi's lawyer at trial claimed that the rumor regarding domestic violence was *not* presented to the disciplinary committee because it would have been unduly prejudicial to Gherardi. Averett testified that the domestic violence rumor was not raised before the committee. Vasquez, by contrast, testified in an admission against interest that she raised the domestic violence rumor with the disciplinary committee, which instructed her to investigate whether it could be corroborated and that an investigation was undertaken in that regard. Coscarelli disagreed with both Averett and Vasquez, and claimed that the domestic violence rumor was briefly discussed with the disciplinary committee and then dropped because it had been resolved due to lack of corroboration several months before the disciplinary committee was first convened. To Gherardi's great detriment, he was never asked or interviewed about any of these personal rumors and thus he was highly prejudiced by Citi, which took into account matters in his personal life for which it never bothered to obtain his input in order to ascertain the truth.

In the words of a recent FINRA arbitration panel in Florida in favor of an employee against Morgan Stanley where the employee was awarded millions of dollars in defamation and tort damages and $500,000 in punitive damages, like in that case, Citi here pursued "A flawed investigation that was conducted, acted

upon, and reported with reckless disregard for its accuracy and completeness and for the defamatory consequences it would have."[1]

## FACTS

### A.   Gherardi's Success at Citi

Gherardi was a respected, successful and valued Citi employee. Ken Strutin, who managed Gherardi from 2005-2009, testified that "[Gherardi] was a consummate professional. …  I have not had anybody better than him. He was a workhorse, very professional, very knowledgeable…I think people respected him for how he performed his job. He just put his nose down and worked all day."  (H'rg Tr., 5/17/17, 172:11-20) Averett concurred in Strutin's assessment. "As advertised he was a sensational FA. He was a great producer, extremely complaint, superhard worker. Just everything that I had heard about him through reputation was proven to be true. He was pleasant. He's always respectful with me.  We had a good relationship." (H'rg Tr., 5/19/17, 12:20-25). Citi's counsel also admitted that, "Gherardi was an excellent FA in terms of his production.  ***He was the top FA***. There's no dispute about that." (H'rg Tr., 5/15/17, 68:16-18) (emphasis added)

Gherardi was promoted to Director at the end of September 2015. A draft version of the announcement, circulated as early as August 4, 2015, stated that the updated titles were meant to award "producers who are outstanding in terms of gross production / financial performance metrics, quality of work and contribution to their branch offices based on two years past performance."  (Cl. Ex. 15)[2]

---

[1] *Morgan Stanley v. Cebert*, FINRA Case No. 14-01088 (Orlando, Florida July 2016).

[2] Gherardi recalled receiving an announcement of the firm-wide promotions, but no such email was produced by Citi. (H'rg Tr., 5/15/17, 188:13-19) Averett testified that he believed that the promotions were put on hold due to the October 2015 moratorium (H'rg Tr., 5/19/17, 216:15-217:1), but conceded that Peraza may have discussed the promotion with Gherardi. (H'rg Tr., 5/19/17, 217:16-20)

During his time at Citi, Gherardi built a book of business of $200 million, consisting of between 500-600 client relationships, which generated $2 million in gross annual commissions.  (H'rg Tr., 5/15/17, 101:13-200; Cl. Ex. 30)

**B.      Gherardi Faces Persistent Poaching Problems at Citi**

Other brokers were jealous of Gherardi's success and repeatedly poached or attempted to poach his clients, even though, as Vasquez testified, poaching "is not allowed" at Citi.  (H'rg Tr.,11/15/17, 112:8-12)  Averett acknowledged that poaching was bound to arise given the nature of the industry and at Citi, in particular:

> [I]t's a little bit the nature of the beast, with a company like Citi for a few reasons. Number one, we are going after an affluent high net worth cliental that by definition is not a big population. It's not a mass market.  And especially in those countries that are our target market. There aren't millions and millions of millionaire clients in countries like Brazil and Argentina and those places. So it's a small pond you're fishing in. Beyond that, Citi has multiple sales channels. That's a legacy of the way the company was built by a guy named Sandy Weill. And so there's multiple sales channels all under the city [Citi] umbrella kind of fishing in the same pond. And so it's somewhat an unfortunate inevitability that from time to time FAs are going to bump into each other on accounts, in a nonmalicious way. It just happens.

(H'rg Tr., 5/19/17, 50:24-51:15)

Citi had no written or formal policy to address poaching (H'rg Tr., 5/19/17, 197:4-6) and Averett received no training on how to deal with poaching as a manager, but he claimed to have established a "fairly consistent approach" in dealing with the matter as it arose.  (H'rg Tr., 5/19/17, 198:21)  Averett's approach was to honor a client's wishes but reallocate accounts to the financial advisor who lost the account due to poaching.  (H'rg Tr., 5/19/17, 198:24-199:6)

Motta had since 2010 (after he got a job at Citi thanks in part to Gherardi's assistance) poached or tried to poach Gherardi's clients on several occasions, including with clients named Ricardo and Gerson

Dalcanale, Suely Roberts, Magg Limited and Carlos Xirau.  (Cl. Ex. 18; H'rg Tr., 5/15/17, 123:18 – 124:10; 126:21-24; 130:7-18; 132:18 – 133:9; 134:18 – 135:3)

Averett was aware of Motta's history of soliciting Gherardi's accounts.  On the Magg Limited successful poach, Averett provided Gherardi with replacement accounts, albeit ones with significant compliance issues that Gherardi needed to fix.  It took nearly two years for Gherardi to receive this "compensation" from the date he lost the Magg Limited account due to Motta's misconduct.

The last of Motta's poaching efforts occurred in March 2015.  Eddie Carreno ("Carreno") then working as Gherardi's sales manager, advised Gherardi that one of his clients, Carlos Xirau ("Xirau"), was requesting a transfer of his account to Motta. Gherardi called Xirau who told him that Motta told him that he and his Citi Private Client ("CPC") division could better service his needs than Gherardi and his IPB division.  (Cl. Ex. 18 at Exhibits E and F) Gherardi reported this conversation to Carreno and Averett in an email dated April 2, 2015.  (Cl. Ex. 18 at Ex. E). Gherardi and Carreno met on April 13, 2015 to discuss the matter and Carreno assured Gherardi that Motta was once again informed that this behavior was unacceptable and would not happen again. (Cl. Ex. 18 at Ex F)

Motta's repeated attempts to poach clients from Gherardi were never appropriately addressed by Citi's management.  Averett testified that he did not think that Motta had done anything wrong with respect to Xirau's account. (H'rg Tr., 5/19/17, 59:4-6)  He stated that he was aware of Motta's reputation as a poacher but that Carreno informed him that Motta "played this one straight."  (H'rg Tr., 5/19/17, 58:23-24)  Averett spoke with Xirau, who told him he was extremely happy with Gherardi.  Averett, however, failed to ask Xirau if, as was reported by Motta, he didn't know who his financial advisor was prior to March of 2015.  (H'rg Tr., 5/19/17, 208:19- 209:4) Motta's assertion that Xirau didn't know the name of his advisor was certainly a lie. Gherardi opened Xirau's account for him and his name appeared on Xirau's

online account statements as his advisor. (H'rg Tr., 5/19/17, 208:1-3) Averett thus closed his eyes to Motta's poaching efforts rather than taking decisive action to stop them.

### C.    The Disciplinary "Incidents"

Gherardi's long career at Citi was free of any disciplinary incidents relating to his clients or account management.  As detailed above, Gherardi dealt with a recurring string of problems involving poaching, which understandably led to frustration on his part since management was ineffective at best and uncaring at worst with respect to the frowned-upon practice.  Other firms, such as UBS, dealt with the practice in a way that was more punitive and likely to stem it from recurring, including compelling the poaching broker to share a large percentage of the stolen commissions with the victimized broker. (H'rg Tr., 5/17/17, 92-96)

### 1.    The 2010 "Bembibre" Incident

In 2010, Gherardi received a Corrective Action Warning over an incident involving a Citi employee, Victor Olivo ("Olivo"), who wanted Gherardi to pay him for client referrals, which Gherardi understood to be illegal and thus he refused because Olivio was not licensed at the time. Olivo tried to pressure Gherardi into paying by warning him that he would refer clients to another advisor named Richardo Bembibre ("Bembibre") if he did not. Gherardi still refused and unbeknownst to Gherardi, Olivo referred a client to Bembibre and Gherardi at the same time. This issue was brought to management's attention.  (H'rg Tr., 5/15/17, 115:18 – 117:14)

A meeting involving Gherardi, Bembibre and Gherardi's then manager Jose Salazar ("Salazar") was held to discuss the matter.  During the meeting Gherardi lost his temper and yelled at Bembibre using profanity.  Gherardi received a Corrective Action Warning soon after and accepted the findings and accompanying punishment.  (H'rg Tr., 5/15/17, 117:11-14)

Gherardi voluntarily participated in anger management classes, which were not mandated by the terms of the Corrective Action Warning. (Cl. Ex. 3)[3]  Citi had a policy of *mandating* anger management classes in situations involving physical violence or direct threats of harm.  If no such behavior occurred, Citi could request but not require that he attend EAP classes on a voluntary basis. (Cl. Ex. 5)

Vasquez confirmed to her superior Maria Morales at the time that, because Gherardi did not threaten anybody, Citi's non-mandatory suggestion to attend EAP would be included in the Corrective Action Warning. (Cl. Ex. 5)  In spite of how she described the incident in 2010 to her boss  (i.e., "his behavior was not of a direct threat"), she misled Coscarelli about it, who testified that it was his understanding that the 2010 incident turned "physical or almost physical; in other words like a physical aggression."  (H'rg Tr., 11/16/17, 83:10-15)[4]  Coscarelli's testimony  mirrored Vasquez's description in 2015 of the 2010 "incident."   In an email in 2015 to her subordinate Jessica Saragovi ("Saragovi"), Vasquez wrote that the "incident" with Bembibre "almost turned physical."  (Cl. Ex. 47)

The Corrective Action Warning was "in effect for 3 months" and listed the "Date Warning Expires" as September 9, 2010. (Cl. Ex. 3)  Gherardi emailed Vasquez on July 9, 2010 to confirm that the Corrective Action Warning would be removed from his personnel file at the expiration date.  She replied that the "warning will be removed once it has expired if the behavior has been corrected and the expectations of improvement and the actions requested in the document have been successfully addressed." (Cl. Ex. 18 at Ex.G)  Gherardi and Salazar met on September 22, 2010 to discuss the

---

[3] The Corrective Action Warned stated "We *prefer* your participation in at least three sessions of Anger Management through our Employee Assistance Program (EAP)." (Cl. Ex. 3) (emphasis added)

[4] Gherardi attended more than the three suggested EAP sessions, mostly to address issues that occurred in other non-work areas of his life, especially since the EAP therapist was coincidentally someone he had consulted earlier in connection with his divorce.  (H'rg Tr., 5/15/17, 118:11-14; H'rg Tr., 11/16/17, 125:17-23)

Corrective Action Warning and Gherardi's progress. On October 12, 2010, Salazar sent Gherardi an email confirming that

> the period of effectiveness of the final warning letter concluded on September 9, 2010. During this period you have demonstrated many positive changes and a significant interest in addressing all issues mentioned on the letter. I commend you on this effort. *This warning letter has been removed from your personal file.*

(Cl. Ex. 4) (emphasis added)

At the September 22, 2010 meeting Salazar told Gherardi that the Corrective Action Warning expired on September 9th, would be removed from his file and would not be used against him in the future. (H'rg Tr., 5/15/17, 147:21 – 148:23)

Gherardi had also received an email from Human Resources about a warning for allegedly failing to report that he was arrested and charged with three felonies.[5]   Those charges were all ultimately dismissed and expunged. (H'rg Tr., 5/15/17, 109:1-11; Cl. Ex. 43)  When he presented proof that he had adequately notified Citi of the arrest, Citi informed him in writing that the warning "has been removed from our files and that it can't be used against you in the future."  (Cl. Ex. 2)  Vasquez testified that this arrest-related final warning was rescinded and confirmed that it could not have been used against Gherardi in the future. (H'rg Tr., 11/15/17, 98:13 – 99:5)

## 2.    The April 2015 "Motta" Incident

On April 21, 2015 Gherardi was walking in the lobby of the building that housed Citi's offices and by chance saw Motta.  Gherardi approached Motta and asked him why he continued to poach his clients. Gherardi recounted the incidents with Dalcanale and Roberts and expressed his opinion that this was unethical and inappropriate.  Gherardi also stated that he would never attempt to poach Motta's clients.

---

[5] The charges were related to a 2008 after-hours traffic stop for alleged DUI.  The police officer who pulled Gherardi over assaulted Gherardi during his search and Gherardi resisted.  The charges were all ultimately dismissed and the record of his arrest was expunged. (H'rg Tr., 5/15/17, 109:1-11; Cl. Ex. 43)

(H'rg Tr., 5/15/17, 138:21-139:18) Another Citi employee, Ricardo Wilson ("Wilson") soon joined the men in the lobby but did not participate in the conversation.

Coscarelli testified that there is nothing wrong or inappropriate about two employees discussing potential issues affecting their relationship as long any such conversation was not "unwanted or disrespectful or aggressive." (H'rg Tr., 11/16/17, 49:8-12)

Security video from three different angles captured the Gherardi-Motta interchange. (Cl. Ex. 6) There are several visual cues as to the nature of the conversation that support Gherardi's position that it was a non-threatening conversation. Motta was free to walk away at any time. Wilson spent most of his time looking at his phone and did not seem to pay attention to the conversation. A woman was seated in a nearby chair and did not turn to look at Gherardi or Motta. A security-desk guard was stationed just a few feet away and did not react at all to the interchange. One of the Panel members at the hearing remarked, "She's paying no attention. They must not be talking very loud." (H'rg Tr., 5/15/17, 146:1-2) Another Panel member also noted this, "She's totally oblivious to it. No one is paying any attention." (H'rg Tr., 5/15/17, 146:22- 24) Gherardi denied yelling or raising his voice in the exchange (H'rg Tr., 5/15/17, 147:5-10) and at the end of the discussion, Gherardi walked away in one direction and Motta and Wilson walked away together. (H'rg Tr., 5/15/17, 146:6-7)

It was not until June 8, 2015 that Averett told Gherardi that Motta had complained about the incident. (H'rg Tr., 5/15/17, 147:14-20) Motta had written an email on April 22, 2015 to Saragovi and threatened to file a police report (which he never did), complaining that his "physical integrity" had been at risk. (Res. Ex. 28) [6]

---

[6] Even before responding to Motta's email about the incident, Saragovi started to build a case to fire Gherardi by asked another human resources employee, Veronika Castro ("Castro"), to track down the Corrective Action Warning from 2010. (Cl. Ex. 53) Saragovi followed up two days later stating that she checked the hard copy files and there were no warnings for Gherardi, which is consistent with what Gherardi was told would happen to the warning in 2010, and asked Castro for help locating a copy. (Cl.

Averett testified that Saragovi, an employee he described as "very mediocre" (H'rg Tr., 5/19/17, 75:21) with a "tendency to leap to conclusions" (H'rg Tr., 5/19/17, 72:4-5) immediately pushed for Gherardi to be fired on the sole basis of Motta's accusation, even before viewing the security video. (H'rg Tr., 5/19/17, 72:6-11) Averett reviewed the security video on May 5, 2015 and remarked in an email that, "Video shows two people having an exchange. From the video you can't really even tell how aggressive the exchange is or isn't, although there is a lot of gesturing. What you can tell, conclusively, is that there was no physical contact between the two." (Cl. Ex. 46)  Averett admitted that he never determined whether Gherardi made any threats during the meeting with Motta in the lobby. (H'rg Tr., 11/14/17, 27:5-11)  Coscarelli admitted that it was impossible to tell from the video if the conversation between Motta and Gherardi was any kind of "aggressive hostile conversation." (H'rg Tr., 11/16/17, 40:16-24)  Guerrero testified that as a disciplinary committee member he didn't give a lot of import to the video because, "I couldn't really tell what was happening." (H'rg Tr., 5/16/17, 185:11-12)  Averett waited nearly a month after viewing the video to even address the "incident" with Gherardi.  This lack of urgency reinforces the point that this "incident" was insignificant and that at the time Citi did not perceive it as involving any threats.

Averett interviewed Motta about the incident, but only before the video had been obtained from security. He did not interview Motta again or show him the video or make any notes of the interview. (H'rg Tr., 11/14/17, 15:2-16)  Averett interviewed Wilson, but found his account worthless, as Wilson did not understand Portuguese. "[W]hile he could generally understand that it was something regarding an

---

Ex. 53) Castro eventually found a copy and also sent the email from Salazar, his manager at the time, informing Gherardi that the warning period had concluded on September 9, 2010 and that the warning would be removed from this file. (Cl. Ex. 53; Cl. Ex. 3)

account, he certainly couldn't relate to me specifics in terms of anything that was said or the severity of what was said." (H'rg Tr., 5/19/17, 75:1-5)

Because neither Averett nor Coscarelli could determine what happened, it is especially telling that Citi chose not to call Motta to testify under oath about what transpired in the meeting.  This interchange was central to the events in this case, but Citi (although controlling Motta as his employer) elected not to have him tell the Panel what happened.  The most logical conclusion is that Motta would not corroborate under oath the description of what happened in his complaint email to Saragovi, and that Citi wanted to shield him from inquiry into his retaliatory motive in complaining about Gherardi, considering that he had just been accused of poaching the Xirau account and had received a warning from management.

Even though nothing of consequence happened in the lobby meeting between Motta and Gherardi, on July 6, 2015, Averett issued Gherardi the "July 2015 Final Warning," (Cl. Ex. 7), apparently under pressure from human resources, which had wanted to fire Gherardi before even learning the full story.

> A lot of what I did candidly was pushing back on Jessica [Saragovi] who wanted Christian fired. I felt like what had happened was serious and, again, unwelcomed and completely unnecessary.  But I didn't think that it quite rose to the level of fireable offense. And so defending my guy, my top FA, I started pushing hard for a final warning as what I viewed as the lesser of two evils.

(H'rg Tr., 5/19/17, 76:4-11)

The July 2015 Final Warning contained a reference to the 2010 Corrective Action Warning, even though the 2010 Corrective Action Warning  was purged from Gherardi's file and unavailable for future use, further undercutting the validity of the July 2015 Final Warning and indicating that Citi was aware that the "incident" with Motta did not warrant a sanction on its own merits.

Gherardi immediately asked Saragovi how he could appeal the July 2015 Final Warning. (Cl. Ex. 8)   Saragovi forwarded Gherardi a Citi Dispute Resolution Form – Step 1 pursuant to Citi's Dispute

Resolution Policy (DRP) referenced in the applicable Employee Handbook. (Cl. Ex. 24) Gherardi filed the Step 1 appeal on July 10, 2015. (Cl. Ex. 9)

Averett responded to the Step 1 appeal by affirming his July 2015 Final Warning in a September 2, 2015 memorandum.  Averett's response stated that Gherardi had no reason to speak with Motta on the matter since the dispute over Xirau's account had been resolved in his favor. (Cl. Ex. 11)  Of course, there was no directive that prevented Gherardi from speaking with Motta.  Averett's response also improperly referenced the purged 2010 Corrective Action Warning.

Gherardi immediately requested the procedure for the next step of Citi's DRP (Cl. Ex. 12) and submitted to Coscarelli an appeal of the July 2015 Final Warning on October 12, 2015, which detailed his long history with Motta and the improper use of the 2010 Corrective Action Warning.

Even though the DRP prohibits retaliation against individuals who invoke it (Cl. Ex. 24 at page R109),  Averett, Vasquez and Saragovi were irate that Gherardi followed through with his appeal of the July 2015 Final Warning.  On September 21, 2015, Saragovi wrote to Vasquez about a meeting she and Averett had that afternoon with Gherardi regarding the July 2015 Final Warning.  "He is adamant the warning is not deserved, *we spoke with him extensively and could not make any reason with him*. He believes it is unfair, unjust and unwarranted and it was a simple conversation amongst colleagues." (Cl. Ex. 48) (emphasis added)   After the Panel asked Vasquez why Gherardi was not suspended instead of terminated following an alleged violation of the July 2015 Final Warning, she responded as follows, which betrayed a retaliatory animus for Gherardi pursuing his appeal:

> He was not showing any -- he was justifying his acts. At that moment, part of the concerns that we were having is that he was expressing dissatisfaction and criticism with his colleagues about their ethical behavior…And yet after while we're doing this, he's disputing. He's not in agreement. He believes that the warning is unfair.  He's not changing behavior.  He's not accepting any wrongdoing.  So that is part of the concerns that we have.

(H'rg Tr., 11/15/17, 105:6-25)

As part of the second step review, Coscarelli was supposed to meet with Gherardi as well as review the materials submitted in support of his appeal. (Cl. Ex. 23) Coscarelli never met with Gherardi, thereby denying Gherardi a full and fair opportunity to present his appeal. (H'rg Tr., 11/16/17, 113:14-17; 114:9-16)

Coscarelli issued a brief decision on November 25, 2015 via email (at 4pm before the Thanksgiving holiday) stating that he believed that the Final Warning was justified. (Cl. Ex. 22). At this point Coscarelli had already met with the disciplinary committee twice, which by November 16, 2015 had approved Averett's decision to terminate Gherardi (Averett had first advocated firing Gherardi on October 28, 2015). (Cl. Ex 38)   Thus, in order to rely on Gherardi's alleged violation of the July 2015 Final Warning as the justification for firing him, Coscarelli's November 25 appeal denial was a foreordained conclusion and was not in good faith.  If he granted the appeal and vacated the July 2015 Final Warning, there would have been no basis for the termination, since purportedly the termination was triggered by Gherardi's violation of the July 2015 Final Warning on account of the "incident" with Menendez. (Cl. Ex. 49)

Saragovi, in a response to Gherardi's request on how he could further appeal the July 2015 Final Warning, advised him on December 9, 2015 that the next step was to arbitrate the dispute under Citi's Employment Arbitration Policy. (Cl. Ex. 24, pages R140-145; Cl. Ex. 25)  Gherardi emailed Saragovi on December 10, 2015 that he was inclined to arbitrate. *Id*.  Under the Employment Arbitration Policy[7]

---

[7] The Dispute Resolution Policy section the Handbook states that, "if a dispute is raised but not resolved through the DRP process, and the dispute is based on a legally protected right, any additional review and appeal must be submitted in accordance with Citi's Employment Arbitration Policy. Arbitration is an external legal process binding upon you and Citi." (Cl Ex 24 at page R107)

Gherardi had a contractual right to exercise the arbitration procedure. The Handbook explicitly states in the Table of Contents that

> EXCEPT FOR THE EMPLOYMENT ARBITRATION POLICY, THE LANGUAGE USED IN THIS HANDBOOK IS NOT INTENDED TO CREATE, NOR SHOULD IT BE INTERPRETED TO CREATE, A LEGAL CONTRACT OR AGREEMENT BETWEEN CITI AND ANY OR ALL OF ITS EMPLOYEES. THIS DISCLAIMER TAKES PRECEDENCE OVER ANY STATEMENT IN THIS HANDBOOK TO THE CONTRARY.

(Cl. Ex. 24) (emphasis added)  Additionally, the Employment Arbitration Policy itself contains a provision which expressly prohibits "Retaliation against employees who file a claim under this Policy, including claims regarding the validity of this Policy or any provision thereof, is expressly prohibited." (Cl. Ex. 24 at page R141)

Saragovi responded to Gherardi's December 10  with a lie, stating that she was "happy to meet with you next week to review" his arbitration option. (Cl. Ex. 25)  Saragovi knew, however, that Gherardi would be terminated the following day and thus would not be able to initiate an arbitration of the July 2015 Final Warning, which would be binding on both Citi and Gherardi. On December 9, she had prepared an email detailing the compensation Gherardi would receive "Based on FA termination date of 12/11/2015." (Cl Ex. 32).  Her lie was intended to lull Gherardi into inaction so he did not file a claim to arbitrate the July 2015 Final Warning before he was fired.  From Saragovi's lie it can be reasonably inferred that Citi would have not been able to take any employment action against Gherardi once he filed an arbitration, in order to avoid triggering the anti-retaliation provision of the EAP.[8]  Further, had he

---

[8] During the hearing, a Panel member asked Gherardi whether, had he had not been fired, he would have exercised his right to arbitrate the issuance of the July 2015 Final Warning. Gherardi responded affirmatively based on his belief that "I received a warning at all in a situation where there was no evidence to support them issuing me a warning." (H'rg Tr., 5/16/17, 68:15-18) The same Panel member pointed out that he was arbitrating the issuance of the July 2015 Final Warning.  "So regardless, you are here in this arbitration and the arbitrators will then decide if Citi properly gave you a final warning or not." (H'rg Tr., 5/16/17, 69:10-13)

prevailed in that arbitration, Citi would not have had any basis to claim he violated a final warning in connection with the Menendez "incident." It was thus in Citi's interest that he not initiate an arbitration before he was fired, so that it could avoid the anti-retaliation provisions in the DRP and the Employment Arbitration Policy.

### 3.     The October 2015 "Menendez" Incident

The second "incident" which Citi claims led to Gherardi's termination involves another poaching effort by a different broker whom Gherardi had never met, Menendez.  On October 22, 2015, Gherardi received a call from Citi's back-office operations unit informing him of a potentially fraudulent transaction involving Freitas, a client whose account he managed.  Coscarelli testified that it was incumbent on Gherardi to call Freitas upon learning of this potential fraud. (H'rg Tr., 11/16/17, 91:21- 92:2)   Gherardi had no knowledge of this transaction and at first could not reach Freitas. (H'rg Tr., 5/16/17, 11:2-19) He received a separate call from a representative from Citi's Doral, Florida branch about Freitas's attempt to open an account and make an investment. (H'rg Tr., 5/16/17, 11:19- 24)

Gherardi eventually reached Freitas via his cellphone.  After learning that Freitas was in the process of opening new accounts with Citi in the Doral branch, Gherardi told him that he already had an account managed by him and that he could make the requested investment for him.  (H'rg Tr., 5/16/17, 12:4-6) Freitas told Gherardi that he had told Menendez, the Citi employee assisting him in Doral, that he already had an account with Gherardi, but that Menendez "explained to him that's all the same thing." (H'rg Tr., 5/16/17, 13:4-5)  Freitas eventually agreed that Gherardi would make the investment for him.

Gherardi spoke to Menendez to see when this account would be closed and to get a better sense of what had happened with Freitas.[9] (H'rg Tr., 5/16/17, 13:17-23). Menendez made it clear to Gherardi that

---

[9] Menendez testified that he only spoke to Gherardi on the telephone once. (H'rg Tr., 11/15/17, 135:15-24)  There is some dispute as to how many times Gherardi and Menendez spoke and if it all occurred on one day or two days.  (H'rg Tr., 1115/17, 137:23 – 138:3); (R. Ex. 48)

"he felt like it was his business, that he did nothing wrong, that he was going to invest the fund for the customer [Freitas]." (H'rg Tr., 5/16/17, 13:24-14:2)   Mindful of the July 2015 Final Warning, Gherardi memorialized their conversation and made his objections to Menendez's behavior known in an email to Menendez, Menendez's manager, Tim Blanchard ("Blanchard") and Gherardi's own sales manager at that point, Peraza, on October 23, 2015.  Gherardi wrote to Menendez, "Please close the brokerage account he has with you and DO NOT solicit the clients I manage." (Cl. Ex. 19)

Menendez responded by denying that he solicited Freitas and that Freitas had not told him that he already had an investment account.[10]  He stated in an email, "The position you put the client in, the client's family which was present and the rest of my office which could hear you screaming and ordering the client around, was embarrassing. Client left nervous and felt threatened." (Cl. Ex. 19) However, Menendez testified that he first recognized something was amiss when his associate Javier Mondragon ("Mondragon") was speaking loudly to someone on the phone. (H'rg Tr., 11/15/17, 130:24-131:3) Gherardi spoke with Mondragon after Freitas passed his own cellphone to him, so Menendez has no first-hand knowledge of whether Gherardi spoke to Freitas, much less the manner in which he did so.[11]

Gherardi responded to Menendez's email that this was inaccurate and informed Menendez that the ethical and professional thing to do when approached by a client already managed by Citi is to refer that client back to the original advisor. At this point, Pereza got Averett involved, who in turn asked Peraza to contact Freitas to find out his version of the events. (Cl. Ex. 19)

---

[10] It is inconceivable that Menendez didn't know Freitas already had an investment account at Citi.  In fact it was Menendez or his associate Javier Mondragon's effort to transfer money from Freitas's existing bank account to the new one they were opening that led to the back office call about potential fraud. Clearly Menendez and his colleague knew Freitas had one or more accounts at Citi and rather than tracking down who his advisor was they proceed to try and move Freitas's money to the new account.

[11] Citi failed to call as a witness its current employee Mondragon, who could have testified as to what transpired.

Menendez admitted in his testimony that, contrary to his email at the time (Cl. Ex. 19), Gherardi did *not* scream or "yell" at him, but instead, that he spoke to him in a "very loud voice, disrespectful." (H'rg Tr., 11/15/17, 130:4-10;159:13-22)  Menendez admitted that he used the wrong "adjective" in his email at the time, meaning that his use of the word "scream" was inaccurate.   (H'rg Tr., 11/15/17, 159:13-22)

Freitas testified at the hearing that Gherardi was "not disrespectful.  He did not yell at me.  He was not disrespectful to me; he did not scream at me." (H'rg Tr., 5/15/17, 91:9-10) Freitas said the same thing to Peraza when he received a call from Peraza on October 27, 2015. (Cl. Ex. 20)  (H'rg Tr., 5/15/17, 91-92)  When asked if he was afraid of Gherardi, Freitas responded "No, no, no. No to be honest…If I had been afraid when I arrived to Venezuela I would not have called him in order to open the investment account." (H'rg Tr., 5/15/17, 92:21-25) In November 2015, Freitas invested $200,000 with Citi using Gherardi as his advisor. (H'rg Tr., 5/16/17, 21:5-13)

Averett asked Peraza to call Freitas to find out what happened.  There are no notes of Peraza's call with Freitas.  Averett testified that Peraza told him that it wss his impression the "client felt a little bullied" (H'rg Tr., 5/19/17, 258:25) but also acknowledged that he knew the client invested $200,000 with Gherardi the following month. (H'rg Tr., 5/19/17, 259:12-15)  Averett didn't speak with Freitas or Gherardi about the "incident" and didn't recall what Peraza told him about Gherardi's rendition of the "incident."[12]  (H'rg Tr., 11/14/17, 86:7-12) After speaking with Peraza, Averett reached out to Coscarelli and Vasquez, because "we had -- we had what appeared to be a violation of a final warning and it was a final warning that was very fresh in everyone's memory at that point… We decided that we needed to potentially take this to the disciplinary committee."  (H'rg Tr., 5/19/17, 124:1-7)  Gherardi testified that

---

[12] The only person in Citi's management chain who did speak with Freitas was Peraza, who is a current Citi employee and was not called by Citi to testify as to the conversation. Peraza also spoke with Menendez as part of his investigation into the "incident." (H'rg Tr., 11/15/17, 138:18-139:3)

Peraza told him that his investigation corroborated Gherardi's version of the facts. (H'rg Tr., 5/16/17, 23:22-24)

Coscarelli testified that Averett told him that "there was a telephone conversation where there was some shouting and inappropriate language and behavior during the call." (H'rg Tr., 11/16/17, 88:3-7) He understood that the call included Menendez and the client. *Id*. He elaborated that he was told that there was "shouting," "threats," "inappropriate behavior," "cursing" and "cusswords" used during the call. (H'rg Tr., 11/16/17, 92:12-24) Of course, this was flatly untrue. Even Menendez did not testify that Gherardi swore or threatened him.

Although Coscarelli was told that the client was contacted, he did not know the client's name, he did not recall what the client had said or to whom, and was unaware that the client kept his account with Gherardi. (H'rg Tr., 11/16/17, 88:18-25 and 89:1-4)

Thus, Averett in almost every respect lied to Coscarelli and the disciplinary committee about the Menendez "incident" in order to cast Gherardi in the worst possible light for the purpose of securing approval for Gherardi's termination.

Further, Coscarelli testified that he was told that the management team had concluded that Gherardi had not acted professionally with Freitas (H'rg Tr., 11/16/17, 101:9-25), which makes Citi's decision not to call Peraza to testify about his call with Freitas even more confounding, unless of course Peraza's sworn testimony would have corroborated Freitas's testimony of what happened. Citi did not cross-examine Freitas and its only retort to Freitas's testimony is that he was not credible, could not be expected to recall the situation and that he has a continuing relationship with Gherardi. (H'rg Tr., 11/17/17, 71:3-19) Freitas, however, did not move his account to Bulltick where Gherardi is employed, but rather kept it at Citi. There is no reason to disbelieve Freitas, who has no stake in the outcome of the case, whereas Averett and Menendez's credibility is totally suspect, especially because Averett

manufactured facts about the "incident" so as to convince the disciplinary committee to approve his termination recommendation.

### D.    Gherardi's Termination

Vasquez sent an email on October 28, 2015 to the disciplinary committee members and provided background for its October 30th meeting: "[T]his employee has a history of some relational/behavioral issues in the office, that had been addressed in multiple occasions and with formality in 2010 where it was documented with a formal warning and directed[13] the employee to complete anger management sessions though our Employee Assistance Program to certify his condition to continue in this working environment." (Cl. Ex. 38) Vasquez also made it clear that the disciplinary committee was being involved, "because we would like to discuss a possible new incident that we had been recently made aware of *and other sensitivities* surrounding this case that warrants a discussion." (Cl. Ex. 38) (emphasis added) In Coscarelli's response to Vasquez's October 28th email, he pressed the committee members to have a "call on this case asap. After discussing with Michael [Averett], the business has a very clear view on how to proceed but as Maria Eugenia [Vasquez] this is *quite sensitive."* (Cl. Ex. 38) (emphasis added)

The disciplinary committee was convened to decide whether to accept Averett's recommendation that Citi terminate Gherardi's employment.  Despite the importance of the disciplinary committee and Coscarelli's testimony that it would have been "good practice" for notes to be made of the various investigations (H'rg Tr., 11/16/17, 112:1-6), Citi claims, incredibly, that there are no notes of the disciplinary committee's deliberations or discussions or of the investigations of the Motta or Menendez "incidents."

---

[13] This is an incorrect characterization of Gherardi's voluntary participation in the EAP.  He was not, and could not, be mandated to attend these sessions because he was never violent or directly threatened anyone. Vasquez's insinuation to the contrary contributed to the tainting of the disciplinary committee.

Among others, the disciplinary committee included a compliance employee named Antonio Guerrero ("Guerrero") who testified at the hearing and whose credibility was not questioned in any respect by Citi.  Guerrero testified that Averett told the disciplinary committee that he was "fearful or scared of any contact with Christian as his volatile nature demonstrated." (H'rg Tr., 5/16/17, 176:11-16)  He said that this information "helped me better understand what was going on, you know, at the branch."  (H'rg Tr., 5/16/17, 177:20-24)  He also said that Vasquez told the disciplinary committee that Freitas was "fearful of Christian" and out of this fear wanted to continue with him as his broker.  (H'rg Tr., 5/16/17, 178:18-179:5)  Of course, there is no evidence that this was the case and this constitutes another lie fed to the disciplinary committee.

Averett characterized his fear as a fear that Gherardi was exhibiting aggressive behavior.  He admitted that "I was fearful of what he may do to me or others" (H'rg Tr., 11/14/17, 74:14-15)  but then insisted that he didn't say he was fearful of Gherardi personally.[14]  (H'rg Tr., 11/14/17, 74:15-16)

Although Citi claims that Gherardi was an at-will employee, Citi did not treat him as one.  Averett testified that it was "unusual and maybe unprecedented that people [at Citi] are fired with no cause." (H'rg Tr., 5/19/17, 94:16-17)  Averett affirmed that, "in my experience at Citi I've never heard of somebody being fired with no cause whatsoever." (H'rg Tr., 5/19/17, 96:16-18) Such a without cause termination would be contrary Citi's "corporate culture." (H'rg Tr., 5/19/17, 96:20) And here, by involving the disciplinary committee to approve the termination, Citi acted in a manner consistent with it determining that "just cause" was required to fire Gherardi.

From the outset of the process leading to Gherardi's termination, there was a concerted effort to include in the deliberations of the disciplinary committee prejudicial and rank innuendo against Gherardi

---

[14] Coscarelli also testified that Averett was "afraid that – there was a concern of Christian's reactions in the office." (H'rg Tr., 11/16/17, 179:16-22).

relating to his personal life. These unfounded allegations included accusations and rumors that Gherardi hit a woman, acted improperly on an airplane towards another Citi employee named Alejandro Vincent ("Vincent") (who spread disparaging rumors about Gherardi's girlfriend) and owned guns. (H'rg Tr., 11/15/17, 177-178; 11/16/17, 117-118)

Averett testified that the alleged domestic violence incident was never brought before the disciplinary committee because he, Vasquez and Coscarelli had determined that it was an unsubstantiated rumor. "And the decision was it was not a factor. It never happened. We have no proof of it. It's irrelevant. And so we put to bed. It was never brought up again." (H'rg Tr., 5/19/17, 134:10-13) During his testimony in May 2015, the Panel directly asked Averett if the issue of domestic violence was brought up at the disciplinary committee meetings and Averett answered unequivocally, "No, it wasn't." (H'rg Tr., 5/19/17, 139:10-13) Averett characterized the domestic violence incident as "bullshit." (H'rg Tr., 5/19/17, 134:4)

Citi's counsel was candid about the highly detrimental impact that the domestic violence rumor would have had on the objectivity of the disciplinary committee, and represented to the Panel that it was not brought to the disciplinary committee's attention:

> We asked the witness on the stand, three times under oath, whether he believes that Mr. Gherardi or acknowledged that Mr. Gherardi physically assaulted anybody then, now or whether he testified that he did. And he stated under oath, he does not and did not. He never has. He never did. The information is simply factual. ***It's also in the record very clearly that Mr. Averett and Mr. Ceccarelli*** [sic] ***and others decided that that information would not be presented to the disciplinary committee because there were no corroboration and because it would be so prejudicial to Mr. Gherardi. And it was not.*** We heard from Mr. Guerrero, who was Mr. Brecher's witness in this case, a third-party who was not known to us. Mr. Guerrero testified about the disciplinary committee meetings. Mr. Guerrero did not mention a word about anything like that ***because it was not raised in the disciplinary committee***. Citi did nothing wrong and everything right about that.

(H'rg Tr., 5/19/17, 172:16-173:11) (emphasis added)

However, Vasquez, testified ***repeatedly*** (including on direct examination from Citi's counsel) that the alleged domestic violence incident was in fact discussed before the disciplinary committee and the committee asked for an investigation to take place as to its validity. (H'rg Tr., 11/15/17, 9-10, 67-68) Vasquez admitted that she heard Averett's testimony about what transpired during the disciplinary committee (H'rg Tr.,11/15/17, 7:17-20) but her testimony was diametrically opposite on the issue of the domestic violence rumor.

Vasquez testified that the disciplinary committee felt it was necessary to have security search for any police reports surrounding the domestic violence allegation.  No such reports were found and the committee was made aware of this at its second meeting. (H'rg Tr., 11/14/17, 10:1-14)  Furthermore, Vasquez testified that the issue of whether Gherardi owned guns was raised before the disciplinary committee and that a search to see if Gherardi was a registered gun owner was conducted, which turned up nothing.  Vasquez said she felt she was obliged to bring this to the committee's attention. (H'rg Tr., 11/14/17, 117:21-118:7) The Panel explicitly asked Vasquez why these incidents were raised and what role they played in the disciplinary committee's decision to terminate Gherardi.

> I had brought the matter because as the human resource's job, my job is to make sure that we have an environment that is conducive. This incident at this moment were signals that there was a pattern of items where interactions with Mr. Gherardi with colleagues and other employees was not welcomed, was intimidating. And was -- he was not showing any intention of changing those.  So that pattern was concerning in terms of, he had already a work violence incident in 2010.  So it's not that this could be something that he protectively could happen. He had already showed that behavior. So this incidents Rodrigo Motta, the possible incident with Vincent was just confirming that pattern. And that were our concerns.

(H'rg Tr., 11/15/17, 76:16-77:6)

Coscarelli claimed he never heard during the disciplinary committee meetings that Gherardi owned guns, (H'rg Tr.,11/16/17, 77:13-16), whereas Vasquez says it was discussed and investigated, but that security office could not substantiate it. (H'rg Tr.,11/15/17, 117-118)

Vasquez also "relayed the alleged [airplane] incident to the committee members… Christian had approached an employee of our Puerto Rican office on an airplane and in some way had threatened him based on some kind of disagreement." (H'rg Tr., 11/14/17, 67:23-68:5)[15]  Coscarelli's recollection was quite different.  He testified that he did not recall the airplane incident being raised before the disciplinary committee.  (H'rg Tr.,11/16/17, 77:17-20) Coscarelli also contradicted both Averett and Vasquez about the domestic violence allegation, saying it was brought up at the first meeting but never brought up again because it was "closed."  (H'rg Tr.,11/16/17, 70-71)

If Vasquez is to be believed, then contrary to Averett and Citi's counsel's representations, Citi did everything wrong and nothing right in raising the domestic violence incident with the disciplinary committee.

The most logical conclusion is that Averett lied about the domestic violence incident not being raised with the disciplinary committee because he knew that, as stated by Citi's counsel, the information unfairly prejudiced Gherardi.  Thus, his lie establishes that he was aware that the "bullshit" allegation was used wrongfully to persuade the disciplinary committee to approve of the termination. Vasquez contradicted her own counsel on this point, and it is difficult to imagine that she would make an admission

---

[15] Vasquez testified that the matter was brought to her attention in February 2015 by a Citi employee, Vincent, who was on the flight. (H'rg Tr., 11/15/17, 10:15-23)  Since the incident could not be substantiated and because it did not occur on Citi property nor was the dispute work related, it was not raised with Gherardi. (H'rg Tr., 11/15/17, 65:7-13) Vasquez testified that there was documentation surrounding this incident, but it was never produced by Citi to Gherardi or presented to the Panel. Vasquez, however, assumed the allegations by Vincent to be true. (H'rg Tr., 11/15/17, 77:14-17)  Thus, she brought to the disciplinary committee an allegation that was not investigated, because she made assumptions that were adverse to Gherardi without even knowing his side of the story.  Perhaps had she determined that Vincent was spreading rumors about his ex-girlfriend (H'rg Tr., 11/16/17, 117-121), she may have thought twice about raising this incident with the disciplinary committee.  However, she was less concerned with the truth and more focused on ensuring Gherardi's termination.  She acted in a grossly reckless manner in bringing to the disciplinary an incident that Averett and Guerrero recalled her raising.

against interest, knowing full well that it was in Citi's best interest that the domestic violence rumor not have been brought to the committee's attention for the reasons Citi's counsel articulated.[16]

Averett and Coscarelli's dissembling about the domestic violence incident touched every point of the situation. For example, Averett testified that he initially brought the issue up to Coscarelli on October 28, 2015 (H'rg Tr., 11/14/17, 63-64), whereas Coscarelli said that by the time the disciplinary committee had been convened in October the rumor had been resolved for several months.  (H'rg Tr.,11/16/17, 35:18-25)

 It is apparent that the disciplinary committee was provided the information about the domestic violence allegation, the rumor about Gherardi's  gun ownership, the airplane "incident," Averett's claim (as stated by Guerrero) that he [Averett] was "afraid" of Gherardi, and Vasquez's mischaracterization of Gherardi as having engaged in workplace violence, because Averett and Vasquez knew that the alleged "incidents" with Motta and Menendez didn't stand up to scrutiny under close examination. By casting Gherardi in the worst possible light -- that he was "violent" and could engage in "workplace violence," a fear articulated by Vasquez (H'rg Tr.,11/15/17, 69:10-12)    -- Averett and Vasquez ensured that the committee would not block his termination, even though this fear was fabricated to manipulate the disciplinary committee.

This alleged risk of workplace violence as a reason for Gherardi's termination as Vasquez articulated (H'rg Tr., 11/15/17, 76:16-77:6) was particularly specious, because Citi did not terminate him for another three weeks after the disciplinary committee decided he should be fired and not for almost six weeks from when the disciplinary committee was first told Averett wanted Gherardi fired. No company with a fear of "liability"  for an employee committing workplace violence (H'rg

---

[16] *Ring Power Corp. v Condado-Perez*, 219 So 3d 1028, 1033 (Fla Dist Ct App 2017)("It is well settled that an admission against interest may be introduced into evidence as substantive evidence of the truth of the matter stated.).

Tr.,11/15/17, 70:17) would retain that employee on premises after deciding to fire the person for that reason. That individual would be escorted out and barred from the workplace immediately. In fact, Citi kept Gherardi employed for another three weeks after the disciplinary committee approved the firing to plan how to redistribute Gherardi's book of business after his termination.

Thus, every reason Citi articulated for Gherardi's termination was a pretext to cover up the fact that he was being fired so it could harm him in order to retain his clients. Averett and Vasquez manufactured a parade of horribles about Gherardi and presented them to Coscarelli and the disciplinary committee so that nobody would oppose the termination out of a concern for "liability" if Gherardi acted violently in accordance with the distorted characterization of him that had been presented. There is simply no valid explanation for all the lies that the disciplinary committee was told and which were testified to by Averett and Vasquez, other than that they had an improper motive to disparage Gherardi.[17]

Averett testified that the decision to fire Gherardi was contentious but the committee ultimately unanimously decided in favor of termination. "There was a lot of debate, but eventually arrived at a unanimous decision." (H'rg Tr., 5/19/17, 141:13-14).

Gherardi was not informed of his termination until he met with Averett, Peraza and Saragovi on December 11, 2015. Averett told Gherardi that he was being terminated for violating the July 2015 Final Warning through his interaction with Menendez and Freitas.[18] (H'rg Tr., 11/14/17, 115:14-25; Cl. Ex 49)

---

[17] *See e.g.*, *Reeves v Sanderson Plumbing Products, Inc.*, 530 US 133, 147 (2000) ( The Supreme Court held that "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. … In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.").

[18] At the time of the Menendez incident the July 2015 Final Warning was not yet final. At that point Gherardi had just submitted an appeal of the July 2015 Final Warning to Coscarelli, which Coscarelli didn't reject until November 25, 2015. Thus, Gherardi could not have violated the July 2015 Final

This alleged rationale and the "talking points" used in Gherardi's termination meeting, were also detailed by Saragovi to another member of the disciplinary committee, Carlos Gonzalez-Stawinski, by email on December 18, 2015. (Cl. Ex. 49)

At first, Gherardi thought he wasn't terminated for cause because Saragovi informed him he was eligible to COBRA health insurance[19] and Gherardi applied for and received unemployment benefit assistance.[20] (H'rg Tr., 5/16/17, 78:2-19).

Gherardi soon learned differently. He received his Form U-5 on January 7, 2016.  (Cl. Ex. 26) The reason listed for his termination was "Business decorum issues, non-investment related conduct." Gherardi also did not receive his deferred compensation totaling $395,830.20 (Cl. Ex. 31), which had been cancelled because Citi decided to characterize his termination as for cause.[21] Gherardi was also not paid his trailers for compensation for the final quarter of 2015, which Gherardi estimated would have amounted to somewhere between $130,000 to $150,000.  (H'rg Tr., 11/16/17, 128:11-23). The termination also

---

Warning in connection with the Menendez incident since it was still subject to review at that point and was thus not "final" in any meaningful sense.

[19] COBRA can be denied where an employee is terminated for gross misconduct. https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/cobra-continuation-health-coverage-compliance

[20] Unemployment benefits can be disallowed if an employee is terminated for malicious misconduct. http://www.stateofflorida.com/articles/florida-unemployment.aspx#one

[21] Saragovi sent an email on December 9, 2015, listing what Gherardi would receive in terms of compensation upon his termination.  Under the heading "Deferred Compensation" she wrote "A termination based on personnel policy violations forfeits deferred compensation." (Cl. Ex. 32)  Vasquez testified that she was unaware of where Saragovi received this information and that it wasn't in any plan. Vasquez testified that the reason for termination was not a factor in determining whether an employee received any deferred compensation.  (H'rg Tr., 11/15/17, 170:4-171:8)  It is clear from Saragovi's email that had his termination been without cause he would have been paid the full amount of the deferred, since otherwise there would have been no reason for her to indicate that he would get nothing of the deferred based on personnel policy violations.

deprived Gherardi of Citi's generous self-insured health insurance policy. Gherardi had a son who was born in 2014 with numerous birth defects and he needed extensive out of state medical procedures, which were all covered by Citi's insurance plan.  Citi paid in all likelihood millions of dollars to cover his son's medical expenses.  At his new firm Gherardi has a health plan with far fewer benefits and it is unlikely to cover the actual expenses his son will incur going forward.

### E.    Gherardi's Attempts to Secure Employment and Mitigate Damages

After his termination, Gherardi sought a position at a variety of financial institutions including large well-established firms such as Wells Fargo, Raymond James & Associates, Deutsche Bank, Morgan Stanley, UBS Financial Services, and Oppenheimer & Co.  Gherardi was unable to secure a position with any of these institutions.

Representatives from some of these institutions testified at the hearing about why their respective firms didn't hire Gherardi.  Frank Amigo ("Amigo") who worked at Raymond James as a manager and was involved in the hiring process testified that the regulatory environment in 2015 was such that there was a "tremendous amount of scrutiny over advisors that had been termed [terminated] and rehired by Raymond James. So that at time, there was some sort informal policy that anybody that was being recruited that had been termed needed to be approved by senior level management and needed to be scrutinized and screened by compliance." (H'rg Tr., 5/17/17, 78:5-11) Compliance did not recommend hiring Gherardi. Amigo testified that the language that is provided on a Form U-5 plays a very important role in the hiring process. (H'rg Tr., 5/17/17, 16:23-17:5).

Sullivan from UBS also testified that in the regulatory environment at the time, if someone had been terminated even "two or three firms ago, they wouldn't be a candidate…the termination was serious and would be a no go for us." (H'rg Tr., 5/17/17, 61:17-25) Gherardi had previously applied for a position at UBS in 2011 and Sullivan had offered him with a generous compensation package. Sullivan testified

that in 2011 he was aware of the 2008 arrest and accompanying charges.  He discussed the matter with Gherardi but felt comfortable making the offer anyway.[22] (H'rg Tr., 5/17/17, 57:22-25).  Gherardi and Sullivan spoke soon after Gherardi's termination and Sullivan advised him that he should focus on the language on the U-5 "because that would really determine where he could work." (H'rg Tr., 5/17/17, 59:18-19)  While Sullivan stated that he didn't really understand what "business decorum" issues meant (H'rg Tr., 5/17/17, 61:10-11) the language on the U-5 did play a role in UBS's decision not to hire Gherardi. (H'rg Tr., 5/17/17, 62:16-24) Ultimately though, Gherardi's termination was the "reason we wouldn't move forward." (H'rg Tr., 5/17/17, 61:11-12)

Strutin testified that the information on Form U-5 played an important role in the hiring process.

> Well, I mean, so when you are looking -- when you are looking to hire somebody, obviously you are doing a background check, you want to make sure they have a clean bill of health, and the U-5 is an indicator of that issue. So you might look at certain things, their client complaints or background, do they have personal bankruptcies, uncertain items that would indicate character issues or, you know, how they operated. But, you know, you really didn't want to hire anybody who had negative stuff on their records.

(H'rg Tr., 5/17/17, 177:11-20)

He also spoke as to the impact of a termination as opposed to other reasons for separation, particularly considering the regulatory environment at the time.

> Well, so if somebody were fired from another firm, I couldn't touch them. I mean even if they had the best story on earth, I couldn't touch them. Our lawyers, our compliance people, just primarily our lawyers, just couldn't touch them. I mean that was really from a pressure service from FINRA. (H'rg Tr., 5/17/17, 178:12-17)

---

[22] Sullivan testified that an offer may have not been possible in 2015 given the arrest record (H'rg Tr., 5/17/17, 65:17 – 66:7), but if the charges were expunged from Gherardi's CRD, as they were as of January 2016, then they would not have presented a problem. (H'rg Tr., 5/17/17, 69:13-25) Sullivan also said that he would not have wanted to hire Gherardi in 2016 because Gherardi had previously rejected his offer in 2011.

A termination constituted a "kiss of death.  If you are permitted to resign, then that leaves the door open and possibilities of to hire." (H'rg Tr., 5/17/17, 185:15-17)  Averett also testified as to the importance of the U-5 in the hiring process. (H'rg Tr., 5/19/17, 187:2-5)

These large well-established firms offered financial recruiting incentives which far outstripped anything that Gherardi would ultimately be able to secure from Bulltick, the firm he eventually joined. Amigo testified that in 2015 the typical recruiting package for a financial advisor would be "anywhere from 80 percent up-front to 125 percent of the trailing 12." (H'rg Tr., 5/17/17, 13:9-10) And the commission payout would have been "somewhere around 46,47 percent." (H'rg Tr., 5/17/17, 14:10) UBS's offer to Gherardi in 2011 included a compensation package in excess of eight million dollars with an initial up front promissory note of $2,734,091. (Cl. Ex. 29); (H'rg Tr., 5/16/17, 92:11-19)

Gherardi ultimately joined Bulltick on March 9, 2016, which is a small wealth management firm operating solely out of Miami.  The small size and type of services offered by the firm dissuaded many of the clients in Gherardi's large book of business from continuing to work with him.  (H'rg Tr., 5/16/17, 211:5-15; 5/15/17, 93-94)

**F.       Citi's Ulterior Motives for Terminating and Defaming Gherardi**

As Citi and Averett have admitted several times throughout the hearing, Gherardi was an exceptionally high producing financial advisor.  If Gherardi left Citi, and his clients chose to go with him to another large financial institution, this would have been harmful to both Citi's P&L and Averett's professional reputation and performance numbers. Averett testified that, "Christian was a huge part of my P&L. P&L is the size of the business you manage. So obviously he was very relevant from that perspective." (H'rg Tr., 5/19/17, 18:17-19)

Citi was particularly anxious to retain its financial advisors and its existing business relationships in the Fall of 2015.  The Office of Comptroller of the Currency ("OCC") had been investigating Citi over

several money laundering matters since 2009. On October 2, 2015, the OCC required Citi to stop onboarding new clients because of concerns over money-laundering.  (H'rg Tr., 5/19/17, 114:14-115:14) That same day Coscarelli sent an email explaining the moratorium on servicing new clients and attached documents explaining the impact on existing clients and financial advisors. (Cl. Ex. 17)

Averett explained how the moratorium would impact financial advisors like Gherardi.  "FAs don't just service existing accounts. They're always looking to open new accounts. That's the way they give themselves a raise and not being able to do so was punitive." According to Averett, the moratorium made Gherardi and his existing book of business "tremendously more valuable" to Citi for two reasons

> Number one, in that type of environment, it's going to be really had [hard] to deliver your financial results. So a guy like Christian, who you could set your clock by in terms of delivering the numbers was already valuable and he became that much more valuable Number two, the nature of the issue we were dealing with was a control issue. And Christian was as good at control as he was at generating revenues, maybe better. He was impeccable in terms of compliance. And so we wanted to rally around producers like Christian who could deliver against our AML requirements time in and time out.

(H'rg Tr., 5/19/17, 116:4-15)

However, Averett also testified that Gherardi was likely the first financial advisor he spoke with concerning the moratorium because he was so concerned that he would leave the firm. When asked if he was concerned if Gherardi would leave due to the imposition of the moratorium Averett responded, "If I was concerned about the FAs leaving, the first FA I would be worried would be Christian...Because he was the top performing FA." (H'rg Tr., 5/19/17, 218:24-219:4)  Coscarelli was also concerned that Citi's competitors would use the moratorium to cast Citi in a negative light as a means to recruit Citi's advisors away.  (H'rg Tr.,11/16/17, 85: 2-7)

Gherardi testified that he had a conversation with Averett on this matter and that Averett was aware that the moratorium put Citi in danger of losing both top talent and clients.  He said that Citi would "take necessary precautions to protect the business." (H'rg Tr., 5/15/17, 192:17-18) Averett agreed with this

description of the conversation and added that he and other leading figures at Citi "had begun to make preparations to develop some kind of retention package that we would offer the top FAs." (H'rg Tr., 5/19/17, 117:9-11). The retention program went in place in January of 2016 soon after Gherardi's termination. (H'rg Tr., 5/19/17, 184:2-4). Virtually nothing was done to retain Gherardi in the immediate aftermath of the moratorium, other than guaranteeing him the same level of commissions as in the prior quarter. (H'rg Tr., 11/16/17, 107:2-18)

Once the moratorium was put in place Averett revived his plan to redistribute Gherardi's book of business, taking into account the real possibility that Gherardi would leave and seek to take his clients elsewhere in the face of the moratorium. "After the moratorium we, of course, refreshed those plans and updated them. Not just for Christian, but for all of our producers. Not for all of our producers, but for the ones we are most concerned about it." (H'rg Tr.,11/19/17, 224: 21-25) While Citi claims it wanted Gherardi to stay, it did little to retain him, and Averett took extensive steps to prepare for his departure, including activating plans to redistribute his book of business and effectuating his termination through the use of lies and innuendos.

Citi's fear that so much business was concentrated in Gherardi's hands had not gone unaddressed in the past. Gherardi faced pressure to move to the CPC division which would require leaving behind most his clients whose accounts were not large enough to be serviced by CPC. (H'rg Tr., 5/15/17, 203:18-204:3) Additionally, in June of 2015, well after the Motta incident occurred, Averett offered Gherardi a management position replacing Carreno as sales manager after he announced he was stepping down. (H'rg Tr., 5/15/17, 172:4-9) Gherardi asked if he could be a producing manager, that is retain his book of business and manage, and Averett responded that he could not. (H'rg Tr., 5/15/17, 172:12-14) Gherardi was uninterested in the position as it would have involved a substantial reduction in his compensation as

he was making around $1 million annually and a sales manager would make somewhere in the neighborhood of a quarter million to a half million. (H'rg Tr., 5/15/17, 172:23-173:4)

Shortly after Averett made the offer,  Gherardi (who took the proposal seriously) told a friend and former manager at Citi, Hector Garcia ("Garcia") about Averett's offer to promote him to sales manager. Garcia testified wasn't surprised that Gherardi was offered this position given his high production numbers. (H'rg Tr., 5/17/17, 225:1-9) He warned Gherardi about Citi's true motivation behind the move and asked if Gherardi would get to keep the residuals from his future stream of fees. When Gherardi answered no, Garcia asked if the salary Citi was offering would match Gherardi's residuals.  Gherardi responded that his residuals were three times as much as the salary on offer.  Garcia said "that makes sense that they would offer you that. They give you that, that means that they get to keep all your residual money…it's great for them but I don't know if that's even great for you unless you want to stop selling." (H'rg Tr., 5/17/17, 225:21-226:4)  Averett confirmed that he had made that offer to Gherardi, but claimed that it was a joke in his mind.  (H'rg Tr., 5/19/17, 22:2-9)

On November 17, 2015, the day after the disciplinary committee ratified the decision to terminate Gherardi, Patrick Rabenau ("Rabenau") a junior employee sent an email to Peraza attaching a file with all of Gherardi's non-Brazilian accounts and asking who Peraza thought could cover these accounts.  (Cl. Ex. 44)  Rabenau only had received his Series 7 license in July of 2015. (H'rg Tr., 5/19/17, 228:21-23) Despite this, he was involved in orchestrating the distribution of Gherardi's book of business.  Rabenau himself ultimately was promoted to replace Gherardi.  He received around $65 million in assets from Gherardi's book of business. (H'rg Tr., 5/19/17, 230:14-18; Cl. Ex. 30) The rest of Gherardi's book was broken up among a number of advisors, thereby making it far more difficult for those assets to leave the firm. This was particularly critical with the moratorium in place, which made it impossible for the firm to replace assets that went elsewhere.  By firing Gherardi and making it impossible for him to secure employment at

a comparable firm,  Averett and Citi ensured that Citi would retain the client assets and $2 million in production, while reducing the payout amount.

If Gherardi had been permitted to resign or terminated without having to explain what was meant by "business decorum issues" as Citi put on his Form U-5 he could have secured a position at a large well-established financial institution.  Such a firm would be more than capable of providing Gherardi with the resources to service his existing clients, and without the burden of Citi's moratorium he could have onboarded new clients.  Citi and Averett knew that it was a precarious time in terms of retaining both talent and clients due to the moratorium. By firing him and filing with FINRA a "dirty" U-5 Form, Citi and Averett made  Gherardi essentially unhireable.  They all but guaranteed that Gherardi would be unable to leave Citi and take his clients with him.

### G.    Gherardi's Compensation

Gherardi's high production numbers at Citi entitled him to commensurate compensation. Gherardi earned as follows: $883,653.73 (2010); $750,158.60 (2011); $905,740.27 (2012); $987,820.99 (2013); $1,017,071.31 (2014) and $994,848.06 (2015).  (Cl. Ex. 21) In comparison at Bulltick, Gherardi earned $236,400.21 in 2016. (Cl. Ex. 21)  As of March 27, 2017, Gherardi's compensation at Bulltick was reduced to approximately $120,000. (Cl. Ex. 37); (H'rg Tr., 5/16/17, 155:15-22)

## II.    LEGAL ANALYSIS

### A.    Adverse Inferences

Citi chose not to produce key witnesses within its control at the arbitration hearing. These witnesses, all of whom are current Citi employees, could have provided testimony favorable to Citi on important events relating to Gherardi's termination that they witnessed first-hand.  The witnesses in question are Rodrigo Motta, Ricardo Wilson, Eligio Peraza, Javier Mondragon, Carlos Gonzalez-

Stawinski and Alejandro Vincent. The Panel should infer that, on account of Citi's failure to call these individuals, they would undermine Citi's and Averett's defenses in this case,

Florida law permits fact-finders to draw an adverse inference against parties who fail to call witnesses within their control who can provide relevant testimony. *Lowder v Economic Opportunity Family Health Ctr. Inc.*, 680 So 2d 1133, 1135 (Fla Dist Ct App 1996) ("An inference adverse to a party based on the party's failure to call a witness is permissible *when it is shown* that the witness is peculiarly within the party's power to produce and the testimony of the witness would elucidate the transaction.").[23] The ability to produce a witness or their availability to a party "must take into account both practical and physical considerations. Thus whether a person is to be regarded as peculiarly within the control of one party may depend as much on his relationship to that party as on his physical availability." *Martinez v. State*, 478 So. 2d 871, 872 (Fla. Dist. Ct. App. 1985). "Ordinarily a party's current employee is under that party's control and may well be peculiarly within the party's power to produce...." *Lowder*, 680 So 2d 1135–36.

While Citi claimed that these witnesses could have also been called by Gherardi and thus an adverse inference is inappropriate, such a conclusion is incorrect. Citi controlled the witnesses and had the ability to interview them in preparation for the case. Gherardi did not have such an opportunity. Further, absent extreme extenuating circumstances, "depositions are strongly discouraged in arbitration." FINRA Arbitration Rule 13510. None of the limited circumstances for when depositions are allowed

---

[23] See also Note 3 to §601.2 "Believability of Witnesses" of the Florida Supreme Court's Standard Jury Instructions in Civil Cases. "*Failure to produce witness.* The committee recommends that no instruction be given. While it may be permissible in some circumstances to instruct the jury regarding inferences arising from a party's failure to produce a witness (compare *Weeks v. Atlantic Coast Line Railroad Co.*, 132 So.2d 315 (Fla. 1st DCA 1961), with *Georgia Southern & Florida Railway Co. v. Perry*, 326 F.2d 921 (5th Cir. 1964)), the committee believes that generally such inferences are more properly referred to in counsel's argument." Available at
http://www.floridasupremecourt.org/civ_jury_instructions/instructions.shtml#600

under Rule 13510 were present, and thus Gherardi could not have reasonably been expected to be able to depose these witnesses. Citi was in the best position to know what they would say and it made a strategic decision not to call them to testify.  The adverse inference is particularly appropriate in this case for these witnesses.

The Panel should draw adverse inferences against Citi as follows:

- **Motta**:  that he would not support any assertion that Gherardi threatened him in the building lobby in any way; that he knowingly tried to poach Gherardi's clients; and that he lied about not poaching Xirau.

- **Wilson**: that he did not hear any threats being made by Gherardi against Motta and that Motta never told him (as they walked away together or after) that Gherardi threatened him).

- **Peraza**: that Freitas confirmed to him that Gherardi acted professionally at all times and that he so informed Averett; that he told Gherardi that his investigation confirmed Gherardi's version of the facts; that Freitas never said in sun or substance that he was bullied by Gherardi to invest with him.

- **Mondragon**: that Gherardi did not yell at Freitas or curse or yell at Menendez or Freitas.

- **Vincent**: that Gherardi spoke with him in a respectful way on the airplane in an effort to stop him from spreading rumors about a woman; that he had made derogatory comments about the woman in question; that he never disclosed to Vasquez that he had made derogatory comments about the woman.

- **Gonzalez-Stawinski**:  as a member of the disciplinary committee he could have rebutted Guerrero's testimony that Averett told committee he was "afraid" of Gherardi. By failing to call him it is reasonable to conclude that Citi knew that he would corroborate Guerrero's version and show that Averett was a liar for denying saying he afraid of Gherardi.

It is notable that Citi elected to rely on second-hand, hearsay versions of the events in question. Citi's failure to call these crucial witnesses is powerful evidence supporting the truth and accuracy Gherardi's case.   Further, the one witness who was present during one of the "incidents," Menendez, recanted his version of events as set forth in his email at the time, admitting that he didn't have any first-hand knowledge of the call between Gherardi and Freitas, and that rather than Gherardi "screaming" as

he wrote in his email, he was instead spoken to loudly (without yelling) as if he was a child being spoken to by a father, which "pissed" and "agitated" him. (H'rg Tr.,11/15/17, 131:14-15; 157:13-19)

It is fair to conclude that there is no accuracy in Menendez's version of what happened at the time. He was annoyed that he was caught red-handed trying to steal Gherardi's client, and rather than conceding he was at fault he instead lied about what happened in order to protect himself from discipline on account of his violation of Citi's anti-poaching poliy. Gherardi's managers seemingly accepted uncritically Menendez's fabricated story in order to fire Gherardi. Citi could have rebutted Freitas's testimony by calling Peraza to testify about his call with Freitas. Rather than do that, however, Citi relied on Averett's recollection of what Peraza told him about Peraza's impression was of what he heard Freitas tell him.

This double-hearsay, which doesn't even purport to recount what Freitas said, is worthless compared to Freitas's own testimony. Averett testified that Gherardi violated the July 15, 2015 Final Warning because he "yelled at Mr. Menendez and Mr. Freitas on the telephone." (H'rg Tr., 11/14/17, 103:11-19) It is fair to conclude that Peraza never told Averett that Freitas told him that Gherardi had acted improperly. In fact, both pillars supporting Averett's grounds for concluding that Gherardi violated the final warning are non-existent, since Menendez stated that Gherardi never yelled at him and Freitas also said the same thing. Further, it is fair to conclude that Averett knew that Gherardi did not yell at Freitas based on what he heard from Peraza, and that is why Citi elected not to call Peraza to testify.

Likewise, even though Coscarelli said it was "best practices" for notes to have been taken during the relevant investigations and disciplinary committee meetings, and Gherardi testified that he always saw notes being taken by human resources (H'rg Tr.,11/16/17, 122) no such notes were ever produced. The Panel should conclude that the notes were either not produced or destroyed so as to cover up evidence that would have been adverse to Citi, or that no notes were ever taken so as to prevent the truth from coming out in the arbitration that it most certainly knew was coming from Gherardi.

**B.**     **Defamation**

Citi is liable for defaming Gherardi through the false language it used on his Form U-5.  The Form U-5 lists under the section entitled Termination Explanation: "Business decorum issues, non-investment related conduct."  The stated rationale of "business decorum issues" was not why Gherardi was terminated.  As detailed above, Gherardi did nothing wrong in his interactions with Motta and Menendez, and thus Citi's position that there was misconduct in those interactions is false.  The U-5 Form also left a grossly misleading impression, because no reasonable firm could draw any conclusion other than that Gherardi was fired for extreme misconduct, especially since Citi would not typically be expected (absent real misconduct) to fire a top performing broker under a firm-wide moratorium prohibiting new business development.

Under Florida law and as recommended by the Florida Supreme Court in its proposed jury instructions for a defamation claim,[24] the following approach is suggested for the Panel to come to an award on the defamation claim:

**1.**     **Defamation Liability**[25]

*a.   Issue whether a defamatory publication concerning claimant was made as claimed:*

---

[24] Florida Supreme Court's Standard Jury Instructions in Civil Cases § 405.9, Issues on Plaintiff's Claim-Private Claimant, Non-Media Defendant. Available at http://www.floridasupremecourt.org/civ_jury_instructions/instructions.shtml#600

[25] Florida has particularly stringent anti-defamation laws.  "Florida's unusually high protection of personal reputation derives from the common consent of humankind and has ancient roots. It is highly valued by civilized people. Our state constitution and common law powerfully support it." *Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. Dist. Ct. App. 2010);  *Lustig v Stone*, 15-20150-CIV, 2015 WL 13326350, at *1 (SD Fla Aug. 18, 2015), *report and recommendation adopted*, 15-20150-CIV, 2015 WL 13326383 (SD Fla Dec. 7, 2015), *affd*, 679 Fed Appx 743 (11th Cir 2017)($1 million in punitive damages and $700,000 in compensatory damages awarded for professional and personal disparagement).

Whether Citi made the statement concerning Gherardi on his U-5 Form as Gherardi claims; and, if so, whether the statement tended to injure Gherardi in his business, reputation, or occupation.[26]   If the greater weight of the evidence[27] supports Gherardi's claim on these issues, then the Panel's award should be for Gherardi in the total amount of his damages.   The Panel should also consider that the U-5 defamed Gherardi by implication, by misleading the readers at other firms into believing that the "business decorum issues" were severe, when in fact the actual "incidents" in question did not reflect any misconduct by Gherardi but were instead fabricated by Citi and Averett to justify his termination. That is, the language on the U-5 created a false impression that Gherardi engaged in misconduct when that was untrue and by omitting important and material facts. [28]

b.   *Defense issues of truth and good motives:*

On its defense of truth and good motives, the issue for the Panel's determination is whether the statement made by Citi was substantially true and was made by Citi with good motives.

---

[26] An action for defamation or libel requires a "false and unprivileged publication by letter, or otherwise, which exposes a person to distrust, hatred, contempt, ridicule or obloquy or which causes such person to be avoided, or which has a tendency to injure such person in their office, occupation, business or employment." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. Dist. Ct. App.), *reh'g denied* (Jan. 29, 2016). *Tilton v Wrobel*, 198 So 3d 909, 910 (Fla Dist Ct App 2016)("proof of liability for defamation per se requires a showing that the declarant knew or should have known the defamatory statement was not true.").

[27] "Greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case." Florida Supreme Court's Standard Jury Instructions in Civil Cases § 401.3.

[28] Florida, in keeping with its aggressive stance against defamation, also recognizes the tort of defamation by implication, which is a subset of the tort of defamation. "The elements of defamation by implication are (1) a juxtaposition of a series of facts so as to imply a defamatory connection between them, or (2) *the creation of a defamatory implication by omitting facts.*" *Klayman v. City Pages*, 650 F. App'x 744, 749 (11th Cir. 2016) (emphasis added).  This theory of liability is necessary because "literally true statements can be defamatory where they create a false impression." *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla.2008).

A statement is substantially true if its substance or gist conveys essentially the same meaning that the truth would have conveyed. In making this determination, you should consider the context in which the statement is made and disregard any minor inaccuracies that do not affect the substance of the statement.

If the greater weight of the evidence of the evidence supports Gherardi's claim on these issues, then your award should be for Gherardi in the total amount his damages.   As explained above, there was no truth to the assertion that Gherardi acted inappropriately in his interactions with Motta and Menendez, and thus Citi's reliance on a truth defense is meritless. Further, Citi did not have good motives, because out of concern that Gherardi would take clients with him to another firm, it sought to hurt him by making him unemployable with the filing of a "dirty" Form U-5.

c.   *Defense issue whether defendant had qualified privilege:*[29]

Citi had a privilege to make a statement on the U-5 even if untrue, provided it did so with proper motives.   The issue for the Panel to decide is therefore whether, as Gherardi claims, Citi made the statement with improper motives abusing that privilege.[30] One makes a false statement about another with improper motives if one's primary motive and purpose in making the statement is to gratify one's ill will, hostility and intent to harm the other, rather than to advance or protect Citi's interest, right or duty to speak

---

[29] Under Florida law, statements on U-5 Forms are entitled to only a qualified privilege. *See Eaton Vance Distributors, Inc. v Ulrich*, 692 So 915 (Fla Dist Ct App 1997).

[30] "Someone who claims defamation arising from a privileged conversation must prove "express malice" on the part of the speaker. The question of express malice largely turns on whether the speaker intended to harm the plaintiff personally.  The Florida Supreme Court described how express malice is proven as follows: Where a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there was express malice and the privilege is destroyed. Strong, angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position "to gratify his malevolence."  *Crestview Hosp. Corp. v Coastal Anesthesia, P.A.*, 203 So 3d 978, 981 (Fla Dist Ct App 2016).

to FINRA on that subject or to advance or protect the interests of FINRA, the entity to whom the statement was made.

If the greater weight of the evidence supports Gherardi's claim that Citi abused any privilege it had, then the Panel's award should be for Gherardi in the total amount of his damages.

### 2.    Defamation Damages[31]

If you find for Gherardi, the Panel should award him an amount of money that will fairly and adequately compensate him for such loss or damage as the greater weight of the evidence shows was caused by the U-5 Form in question. You shall consider the following elements of damage:

*a.    Injury to reputation or health; shame, humiliation, mental anguish, hurt feelings:*

Any injury to reputation or health and any shame, humiliation, mental anguish, and hurt feelings experienced in the past or to be experienced in the future. There is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence.  Gherardi suggests for this category damages of $2 million, representing two years of his compensation at Citi.

*b.    Lost earnings, lost working time, lost earning capacity:*

Any earnings lost in the past and any loss of ability to earn money in the future.  For lost past earnings, Gherardi seeks $1.6 million.  He seeks $2 million in lost future earnings.

*c.    Reduction to present value:*

Any amounts which you allow in damages for loss of ability to earn money in the future  should be reduced to their present money value.

---

[31] Florida Supreme Court's Standard Jury Instructions in Civil Cases § 405.10, Defamation Damages, Available at http://www.floridasupremecourt.org/civ_jury_instructions/instructions.shtml#600

*d.   Nominal damages:*

General damages are conclusively presumed to result in cases of defamation per se and nominal damages are presumed as a matter of law.[32]  Gherardi requests nominal damages of at least $100 in the event the Panel for some reason determines that it is impossible to calculate his actual damages for the defamation.

*e.   Punitive damages:*

If you find for Gherardi and against Citi, you should consider whether, in addition to compensatory and/or nominal damages, punitive damages are warranted in the circumstances of this case as a punishment and as a deterrent to others.  In all civil actions, the plaintiff must establish by clear and convincing evidence[33] its entitlement to an award of punitive damages. The "greater weight of the evidence" burden of proof applies to a determination of the amount of damages.[34]

Punitive damages are warranted if you find by clear and convincing evidence that Citi's primary purpose in making the statement was to indulge ill will, hostility, and an intent to harm Gherardi.[35]

---

[32] *Lawnwood Med. Ctr., Inc. v Sadow, 43 So 3d 710, 734* (Fla Dist Ct App 2010)("If the jury finds defendant liable for slander per se, it must be instructed that nominal damages are deemed established as a matter of law.").

[33] "Clear and convincing evidence" differs from the "greater weight of the evidence" in that it is more compelling and persuasive.] "Clear and convincing evidence" is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction without hesitation about the matter in issue.   Florida Supreme Court's Standard Jury Instructions in Civil Cases § 411.3.

[34] Fla Stat Ann § 768.725.

[35] Florida courts have held that damages may be awarded in claims involving defamation per se even if a claimant's compensatory damages are non-existent or cannot be established.  Punitive damages may be the only remedy available to the claimant.  "[W]hen the claim is defamation per se, liability itself creates a conclusive legal presumption of loss or damage and is alone sufficient for the jury to consider punitive damages. Therefore cause of liability for slander per se, coupled with an express finding that the slander was intended to injure plaintiff and did in fact cause injury, authorizes the jury to consider and assess punitive damages without any finding of an amount of compensatory damage." *Lawnwood Med. Ctr.,*

Gherardi seeks punitive damages of $5.6 million, representing a number equal to his actual damages.  This number would also be appropriate in the event nominal damages are also awarded (*see* footnote 35).

*f. Expungement of Defamatory U-5:*

Gherardi requests that the Panel order the expungement and reformation of his false and defamatory U-5 Form so as to state that he was terminated "without cause."

******** 

Here, Citi had a significant motive to defame Gherardi on his U-5 Form and impede his employment at another firm by misusing the U-5 to "blackball" him.[36] Citi knew well that combined with his firing, other firms would look to the U-5 Form in making employment decisions.

The omission of the full context surrounding Gherardi's termination left a grossly misleading implication about Gherardi's behavior at Citi which was highly damaging to his professional reputation. If the Panel concludes that, in connection with the Motta and Menendez "incidents" Gherardi acted properly, then Gherardi will have established his claim for the falsity of the language on the U-5 Form. Further, if the Panel concludes that Citi published the false U-5 Form in order to harm Gherardi, i.e., make it difficult for him to find comparable employment, he will have overcome the qualified privileged that otherwise protected Citi's false statements on the U-5.  Further, the Panel should consider that Citi and Averett  corrupted the disciplinary committee with prejudicial and false information to secure its agreement for Gherardi's termination. This further justifies assessment punitive damages. The only way

---

*Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. Dist. Ct. App. 2010) (upholding a punitive damage award of $5 million against an employer for slandering employee even when the employee was not entitled to any compensatory damages).

[36] *Baravati v Josephthal, Lyon & Ross, Inc.*, 28 F3d 704, 708 (7th Cir 1994)(recognizing that broker dealers "blackball" brokers with derogatory U-5 Forms).

Citi, Averett and Vasquez could ensure that Gherardi would not leave and take his clients with him was to secure the disciplinary committee's approval to terminate him for cause. Knowing that the Motta "incident" was insufficient, Averett and Vasquez poisoned the committee with highly prejudicial rumors about non-work related matters and lies about Averett fearing Gherardi, and false versions of what happened in the Menendez "incident."   The entire disciplinary committee process was tainted and establishes Citi's ill will, hostility and intent to harm.

Further, Citi has argued that other firms did not hire Gherardi not because of the U-5, but because his expunged arrest record appeared on his FINRA records, because he told other firms about the "incidents" and for other reasons, and thus the U-5 cannot be directly linked to his not being hired. However, several of the managers from other firms acknowledged that the U-5 Form played a role in the hiring process and accordingly, its damage and effect cannot be discounted.

### C. Breach of Contract/Breach of the EAP & DRP

Citi's Employment Arbitration Policy (EAP) contains a provision expressly prohibiting retaliation for use of the EAP.   "Retaliation against employees who file a claim under this Policy, including claims regarding the validity of this Policy or any provision thereof, is expressly prohibited." The EAP is a legal contract between Citi and Gherardi.   Additionally, the EAP's scope included "disputes based on legally protected rights that are submitted to but aren't resolved by the Dispute Resolution Policy." (Cl. Ex. 24)

 Gherardi completed both appeals under the two-step DRP procedure immediately after receiving the July 2015 Final Warning.  He then advised Citi in December 2015 that he was inclined to pursue arbitration under the EAP, as the DRP and EAP both required him to do and as he was advised by Saragovi on December 9 he was required to do under the DRP and EAP.  Although Citi had made the decision to fire Gherardi on November 16, 2015, it did not fire him in the ensuing three weeks as it implemented a plan to redistribute his book of business.  Once Gherardi advised Citi he wanted to arbitrate the July 2015

Final Warning Citi recognized that the entire premise of its termination decision would be eliminated if he prevailed in his arbitration challenging the validity of the July 2015 Final Warning.  Thus, Saragovi lied to Gherardi to forestall his filing of the arbitration until he was fired.  Citi either retaliated against Gherardi for invoking arbitration or anticipatorily repudiated the anti-retaliation policy knowing full well that he would arbitrate the validity of the July 2015 Final Warning. Either way he was harmed by Citi failing to abide by its non-retaliation policy. If he had prevailed, then the reason by which Citi justified the termination would have disappeared   In effect, Citi anticipatorily repudiated its EAP's anti-retaliation policy by firing Gherardi before he could secure its protections.

To show breach of contract under Florida law, a plaintiff "must prove (1) a valid contract; (2) a material breach; and (3) damages." *Murciano v. Garcia*, 958 So.2d 423, 423 (Fla. Dist. Ct. App. 2007). "The basic elements of an enforceable contract are offer, acceptance, consideration, and sufficient specification of essential terms." *Jericho All-Weather Opportunity Fund, LP v. Pier Seventeen Marina & Yacht Club, LLC,* 207 So.3d 938, 941 (Fla. Dist. Ct. App. 2016).  Here, Gherardi was precluded from securing the benefits of the EAP by Citi's preemptive, retaliatory effort to block him from establishing that the July 2015 Final Warning was not warranted. He is thus entitled to lost past wages and lost future earnings, as detailed above.

### D.   <u>Wrongful Termination</u>

The evidence established that Gherardi could not be fired by Citi absent just cause under the actual practice at  the firm as was applied to him. The cause put forth by Citi – that Gherardi violated the July 2015 Final Warning in connection with the Menendez "incident" -- was pretextual, meant to cover-up its real, motive, which was to harm him so as to prevent him from taking clients to another firm  Gherardi did not violate the terms of the July 2015 Final Warning (which never should have been issued). Moreover, he did not do anything inappropriate in his dealings with Motta or Menendez.

Further, because of its obligation to arbitrate his termination under his U-4 Form, the Panel is empowered to determine whether Citi had "cause" to do so.  In *PaineWebber v. Argon*, 49 F.3d 347 (8th Cir.1995), the Eighth Circuit held that even though Kansas was an at will employment state, the arbitration agreement involved in that case changed the at-will nature of the employment. "If Agron's employment was purely at-will, the arbitration procedure designed to interpret that employment relationship would serve no identifiable purpose." *Id*. at 352. "This [arbitration] process necessarily alters the employment relationship from at-will to something else—*some standard of discernable cause is inherently required* in this context where an arbitration panel is called on to interpret the employment relationship." *Id.* (emphasis added); *See also Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310, 312–13 (7th Cir. 1981) ("It has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for 'just cause.'") (citing *Int'l. Ass'n. of Machinists v. Campbell Soup Co.*, 406 F.2d 1223, 1226-27 (7th Cir.), *cert. denied*, 396 U.S. 820, 90 S.Ct. 57, 24 L.Ed.2d 70 (1969).

More recently, in *Countrywide Sec. Corp. v. Varga*, 2009 WL 10674333  (C.D. Cal. Aug. 19, 2009), the U.S. District Court in Los Angeles, citing *Agron*, held that the existence of an employment contract which expressly provided that the employment relationship was at-will did not bar a claim for wrongful termination when the parties have an arbitration agreement.

Citi had no cause to terminate Gherardi's employment and the termination severely impaired his ability to secure similar employment.  This Panel is empowered to determine whether Citi had cause to fire Gherardi, which it did not as the facts show, and award him damages for his past lost earnings and future lost earnings on account of his wrongful termination as detailed above.  Citi also violated Gherardi's right to be paid his commissions and deferred compensation, which was payable because no cause existed for his termination.  Thus, he seeks the $150,000 in 4th quarter 2015 trailers and the $395,830.22 (Cl. Ex. 31) in deferred compensation that Citi forfeited based on the alleged cause it used to fire him.

**E.       Tortious Interference with an Advantageous Business Relationship**

Averett interfered with Gherardi's employment relationship with Citi to his financial and professional detriment.  He did so by lying about the Menendez "incident" to the disciplinary committee and Coscarelli and falsely representing that he was "afraid" of Gherardi and recklessly giving weight to rumors about Gherardi's personal life without determining the truth of the matter and including these allegations in the disciplinary committee's decision to terminate Gherardi.

There are four elements to a claim for tortious interference: "(1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001).

Although typically a claim of tortious interference cannot be asserted against an employee or representative of the entity with whom the claimant has the business relationship, an exception exists such a person acts solely with ulterior purposes and the advice is not in the principal's best interest." *Alexis v. Ventura*, 66 So. 3d 986, 988 (Fla.3d DCA 2011) (The phrase "sole ulterior purpose" has been interpreted by Florida courts to mean "a singular improper purpose detrimental to the employer's interests.") *Id.* Here, Averett placed his own financial gain above Citi's interest in ensuring that it filed an accurate U-5 Form with FINRA.  See e.g. FINRA Notice to Members 10-39("This *Notice* reminds firms of their obligation to provide timely, complete and accurate information on Form U5 (Uniform Termination Notice for Securities Industry Registration")    Averett misrepresented numerous facts and circumstances to Coscarelli and the disciplinary committee about Gherardi to secure his termination and therefore tortiously interfered with Gherardi's employment with Citi, causing him to incur lost past and future earnings.

### III.   CONCLUSION

Gherardi seeks compensatory and punitive damages for the defamatory U-5 Form that Citi filed; back pay and front pay for his wrongful termination and breach of the EAP; payment of his 4th quarter 2015 trailers and his deferred compensation for his termination without cause; damages for lost past and future earnings and punitive damages for tortious interference against Averett; and injunctive relief expunging and reforming his U-5 Form. Gherardi also requests that all FINRA forum fees and costs be assessed against Citi in accordance with Citi's EAP, which provides that Citi pay all such fees and costs.

Dated: New York, New York
      January 19, 2018

                        Respectfully submitted,

                        Law Office of Ethan A. Brecher, LLC

                        /s/ Ethan A. Brecher
                        Ethan A. Brecher, Esq.
                        600 Third Avenue, 2nd Floor
                        New York, NY 10016
                        Phone: (646) 571-2440
                        Fax: (888) 821-0246
                        Email: ethan@ethanbrecherlaw.com