# EXHIBIT
# R

# Morgan Lewis

**Ira G. Rosenstein**
Partner
+1.212.309.6960
ira.rosenstein@morganlewis.com

January 19, 2018

**<u>VIA FINRA DR PORTAL</u>**
Jennifer Rodriguez LaMont
Case Administrator
FINRA Dispute Resolution
Southeast Regional Office
Boca Center Tower 1
5200 Town Center Circle, Suite 200
Boca Raton, FL 33486-1017

Re:       *Christian S. Gherardi v. Citigroup Global Markets, Inc. and Michael R. Averett*
          *FINRA Case No. 16-01001*

TO THE PANEL:

On behalf of Citigroup Global Markets, Inc. ("Citi" or "the Company") and Michael

Averett ("Mr. Averett") (collectively "Respondents"), the undersigned respectfully submits

Respondents' Post-Hearing Brief.

**Morgan, Lewis & Bockius LLP**

101 Park Avenue
New York, NY  10178-0060
United States

**T** +1.212.309.6000
**F** +1.212.309.6001

January 19, 2018
Page 2

## I. <u>PRELIMINARY STATEMENT</u>

Over nine days of hearings, Claimant could not and did not meet his burden to prove his assertions that he was wrongfully terminated, that Citi filed a defamatory Form U-5 with FINRA, or that Citi or Mr. Averett tortiously interfered with Claimant's business relationships. The evidence, both in contemporaneous documents and credible sworn testimony, establishes conclusively that Claimant's allegations are entirely unfounded and should accordingly be denied in their entirety.

The evidence in this case demonstrates that from 1996 until his termination in 2015, Christian Gherardi was a Financial Advisor ("FA"), employed "at-will" by Citi.  At the time of his termination he worked under the direction of testifying witness Michael Averett, Director of the Miami Financial Complex and Business Head for Citigold International and Citigold Private Client in a Citi Miami, Florida branch.

Mr. Gherardi's employment was terminated by Citi effective December 11, 2015 because he engaged in a pattern of inappropriate communications with his colleagues and showed a lack of business decorum inconsistent with Citi's Code of Conduct and Organizational Values.  He received his first corrective action "warning" for such conduct in July 2010 after shouting at a co-worker, using profane and insulting language in front of his managers.  The 2010 corrective action warning noted that his conduct had violated Citi's Organizational Values and Code of Conduct, and that future conduct of that type would not be tolerated.

After participating in anger management counseling paid for by Citi, Claimant was able to avoid formal discipline for the next several years.  However, in April 2015, he again initiated an

January 19, 2018
Page 3

aggressive, intimidating conversation with a co-worker regarding that co-worker's interaction with a customer.  As a result of his conduct, his manager, Mr. Averett issued a final warning dated June 25, 2015.  In the final warning, Mr. Averett noted that Mr. Gherardi's initiation of a public confrontation with his co-worker was even more troubling because the two FA's involved had already discussed the issue with their manager and it had been resolved.  Mr. Gherardi was specifically warned again that if he had any issues with colleagues, he must bring his concerns to his managers for resolution and that he must not initiate direct contact with his co-workers.  He also was reminded again that any further conduct of a similar type would be a serious violation and would result in his termination.

Unfortunately, just a few months later, Mr. Gherardi disregarded that explicit instruction and once again directly engaged in another confrontation with a different FA, testifying witness Jorge Menendez, regarding Mr. Menendez's contact with a customer, Jose Ludgerio Freitas.  This time Claimant confronted the FA by telephone directly in front of Mr. Freitas and his family. Given his repeated breaches of business decorum and seeming unwillingness or inability to control his behavior and comply with management directives, Mr. Averett in consultation with Citi's Human Resources department decided that a disciplinary committee (the "Committee") should be convened to determine how Citi should respond to Claimant's actions. Ultimately, the Committee determined, and Mr. Averett agreed, that Mr. Gherardi could not continue as an employee or representative of Citi.  Accordingly, his employment was terminated effective December 11, 2015.

Consistent with its mandated regulatory duties, Citi reported Mr. Gherardi's involuntary termination on his Form U-5 to FINRA.  The reason provided for Claimant's termination was

January 19, 2018
Page 4

generously and accurately stated to be "Business decorum issues, non-investment related conduct." Contrary to the allegations in his SOC, Respondents took no steps to try to harm Mr. Gherardi's future employment prospects or to prevent him from continuing to work with customers with whom he had developed a relationship during his work at Citi.  In the end, Citi simply determined, as was its right, that Mr. Gherardi could no longer represent the organization as an employee.

## II.    SUMMARY OF KEY FACTS CONFIRMED AT HEARING

During the hearing in this case, Respondent established the following facts, which were also accurately described in its Statement of Position and the Opening Statement.  Claimant presented no contrary evidence at hearing and for the most part, and on all material points, confirmed or did not dispute Citi's evidentiary presentation

### A.    Citi's Code of Conduct and Company Policies Promote a Respectful Workplace.

1.    Citi is an equal opportunity employer, dedicated to providing a safe and productive work environment for all of its employees, and it has specific policies and procedures in place regarding respect and professional courtesy in the workplace. Citi Employee Handbook (the "Handbook"), Respondents' ("Resps.") Exhibit ("Ex.") 2, at R000087.

2.    Citi has adopted a Code of Conduct ("The Code") that outlines the Company's expectations regarding the business, personal, and ethical conduct of every employee. The Code, Resps. Ex. 4.

January 19, 2018
Page 5

3.      The Code provides, "[w]e also work to create a Citi where responsible finance is practiced, where employees treat each other with mutual respect and dignity and where a healthy work/life balance is encouraged."  Resps. Ex. 4, at R000187.

4.      The Code further states that "[t]hreats or acts of violence, whether committed by or against managers, co-workers, clients, vendors, or visitors in the workplace will not be tolerated and should be reported immediately.  Any employee who threatens or perpetuates a violent act will be subject to disciplinary action up to and including termination of employment, civil litigation, and/or criminal prosecution."  *Id*. at R000190.

5.      The Code, the Handbook, and other hiring documents inform employees that their employment is at-will and can be terminated by the employee or Citi at any time.  Resps. Ex. 2, at R000085, R000135; Resps. Ex. 4, at R000176.

6.      The Handbook reiterates that threats against co-workers will not be tolerated and are grounds for disciplinary action. Resps. Ex. 2, at R000091.

7.      The Handbook also states that employees can use the Dispute Resolution Process ("DRP") to informally resolve disagreements, but the DRP does not waive Citi's rights under the employment at-will doctrine.  *Id*. at R000107.

8.      The Arbitration Policy within the Handbook affirms that resolving matters through arbitration does not create a contract of employment for a definite period of time, nor does Citi waive its rights under the employment at-will doctrine with arbitration.  *Id*. at R000140.

January 19, 2018
Page 6

    **B.**    <u>**Claimant's Employment**</u>

9.    Claimant was hired in 1996 in Citi's Miami Financial Complex. He subsequently accepted a position there as an FA in 1997 and worked in that capacity until his termination in December 2015.  Arbitration Transcript ("Arb. Tr.") May 15, 2017, 100.

10.    Claimant was subject to the Code, the Handbook and all applicable employment policies throughout his employment. Arb. Tr. May 16, 2017, at 226.

11.    At all times Claimant's employment was at-will, meaning that he could leave Citi at any time or he could be terminated at any time for any lawful reason. Resps. Ex. 2, at R000085, R000135; Resps. Ex. 4, at R000176; Arb. Tr. May 16, 2017, at 226.  Claimant agreed at hearing that he was employed at-will. Arb. Tr. May 16, 2017, at 218-26.

12.    Beginning in January 2014, Claimant indirectly reported to Michael Averett, a Director and Miami Financial Complex Business Head for Citigold International and Citigold Private Client. Organization Charts, Resps. Ex. 5; Arb. Tr. May 15, 2017, at 104-05; Arb. Tr. May 18, 2017, at 259-60, 270-73; Arb. Tr. May 19, 2017, at 51.  Mr. Averett and Mr. Gherardi had a good working relationship.  Mr. Averett assisted Claimant in obtaining valuable commission and then maintained friendly interactions. Arb. Tr. May 18, 2017, at 134; Arb. Tr. May 19, 2017, at 17.

13.    During the time he reported to Mr. Averett, Claimant was the highest producer in the branch focusing largely on relationships with clients from South America, and in particular, Brazil, where his Portuguese language skills were particularly useful.  Arb. Tr. May 15, 2017, at

January 19, 2018
Page 7

101-02; Arb. Tr. May 19, 2017, at 18.  He also had a clean compliance record and a solid reputation for working within regulatory guidelines. The combination of his high production, strong compliance record and Portuguese language skills made him highly valuable to Citi, his department and to Mr. Averett. Arb. Tr. May 19, 2017, at 18.[1]

### C.   Claimant's Pattern of Unprofessional Behavior Resulted in his Termination.

14.   In 2008, Claimant was arrested and charged with attacking a police officer after a traffic stop.  Mr. Gherardi testified at length regarding this incident. Arb. Tr. May 15, 2017, at 107-09.  Claimant was not disciplined by Citi for the arrest, but the arrest remained on his CRD throughout his employment.  CRD of Christian Gherardi as of Dec. 21, 2015, Resps. Ex. 21. It was not removed until after his termination by Citi in 2016.  Arb. Tr. May 18, 2017, at 215; Letter from FINRA to David Greenberger dated Jan. 28, 2016 regarding expungement of information from Claimant's CRD, Cl. Ex. 41.

15.   In June 2010, Claimant was involved in a serious altercation with a co-worker involving his use of profane language, name-calling, and insults to a co-worker in front of a manager. The incident was described in a contemporaneous document submitted as evidence in this case.  Resps. Ex. 26; Arb. Tr. May 18, 2017, at 23-26, 38-41.

---

[1]  Compliance issues were particularly important to the business in 2015 and 2016 in light of regulatory scrutiny on its international with business. Arb. Tr. Nov. 14, 2017, at 40-41. Language skills were also critical to the business. Many of Citi's clients in the Miami complex were based in Latin America with a particularly large contingent from Brazil. Arb. Tr. May 18, 2017, at 266. Accordingly, FA's with Spanish and Portuguese language skills were critical. Arb. Tr. May 19, 2017, at 152-53.  Only six FA's reporting to Mr. Averett in 2015 were proficient in Portuguese.  Arb. Tr. May 19, 2017, at 153.

January 19, 2018
Page 8

16.     As a result of his serious violation of the Code, Claimant was issued a final written warning. 2010 Corrective Action Warning, Claimant's ("Cl.") Ex. 3. Claimant acknowledged that his behavior was wrong at the time and during this hearing.  Arb. Tr. May 15, 2017, at 169.

17.     The 2010 Corrective Action Warning unequivocally stated that further behavior of that type would not be tolerated, and could result in a termination for cause as well as disclosure on his broker record. Cl. Ex. 3.  In particular, it states, "The objective of this warning is to clearly and in writing communicate that your conduct and behavior was completely unacceptable and that another situation or any further behavior of this kind will not be tolerated. If you engage in other inappropriate behavior or conduct, you may be subject to termination of employment for cause, and the reasons for termination may be recorded on your broker record. *This warning will be in effect for 3 months, but the company will not tolerate any other inappropriate behavior or violation of policies, procedures, Organizational Values or Citi's Code of Conduct.*" *Id.* (emphasis added). Claimant acknowledged during the hearing that he did not interpret the warning to mean that after three months the company would tolerate inappropriate behavior, violation of policies, procedures, organizational values, or Citi's Code of Conduct. Arb. Tr. May 18, 2017, at 56-57.

18.     The 2010 Warning by its term expired after 90 days so that Claimant was again eligible for benefits available to employees in good standing, such as salary increases and promotions. Arb. Tr. Nov. 14, 2017, at 161-64, 182.  The "expiration" of the notice terms and removal from Claimant's file were not intended as an erasure of the event from the collective memory of his employer. Arb. Tr. May 18, 2017, at 58-59; Arb. Tr. Nov. 14, 2017, at 164-65, 185.

January 19, 2018
Page 9

19.     Consistent with that common sense notion, Claimant was unequivocally told in the document and orally that any further conduct of this nature would result in discipline including termination and would not be tolerated. Cl. Ex. 3; Arb. Tr. Nov. 14, 2017, at 16, 161-62, 165, 181.

20.     The 2010 Warning letter was removed from Claimant's personnel file as promised but was maintained by Citi's HR department.  Arb. Tr. Nov. 15, 2017, at 98-99, 174-75.

21.     In order to assist Claimant in managing his behavior and avoiding future outbursts, Citi paid for his participation in several anger management training sessions. Arb. Tr. May 18, 2017, at 55; Arb. Tr. Nov. 14, 2017, at 156-57.[2]

22.     In April, 2015, Claimant was involved in an incident with a co-worker, Rodrigo Motta. Rodrigo Motta Email to Jessica Saragovi April 22, 2015, Resps. Ex. 28.  Claimant had a prior relationship with Mr. Motta and testified that he had a negative opinion of Mr. Motta preceding their interaction in April, believing that Motta had targeted customers assigned to Claimant with an eye towards "poaching" them. Arb. Tr. May 15, 2017, at 124-135.

23.     The incident was precipitated by Claimant, who was apparently upset that Mr. Motta had spoken with a customer, Carlos Xirau, with whom Claimant had worked. Resps. Ex. 28.

---

[2]  In 2008, Claimant was issued a separate written reprimand related to his reporting of his 2008 arrest. Arb. Tr. Nov. 15, 2017, at 96-97; Email Chain, Cl. Ex. 2. Ultimately, Claimant demonstrated that the reprimand was issued erroneously and it was removed from his file. Arb. Tr. Nov. 15, 2017, at 98-99; Cl. Ex. 2. Unlike the 2010 incident, Citi representatives in human resources specifically noted that the erroneous reprimand would not be used against him in the future given that it should not have been issued in the first place. Arb. Tr. Nov. 15, 2017, at 98. Tellingly, no such direction was given to him with regard to the 2010 Warning, which was not erroneously given. Cl. Ex. 3.

January 19, 2018
Page 10

Their joint manager at the time, Eddie Carreño first discussed the issue with Claimant and Mr. Motta. *Id.*

24.     Mr. Averett then spoke with Mr. Xirau, the customer to confirm events. Arb. Tr. May 19, 2017, at 59; Email, Resps. Ex. 31. By April 13, 2015, Mr. Averett had informed Claimant and Mr. Motta that the issue was resolved and that Claimant would continue to service Mr. Xirau's account.  Arb. Tr. May 18, 2017, at 104. Mr. Carreño specifically told Claimant that the matter should be considered concluded. Gherardi Email to Eddie Carreno Apr. 13, 2015, Resps. Ex. 27; Arb. Tr. May 19, 2017, at 62.

25.     One week after he had been told the issue had been resolved in his favor, on April 21, 2015, Claimant nevertheless, chose to confront Mr. Motta in the lobby of Citi's office building and engage in a public conversation with Mr. Motta about the same issue.  Resps. Ex. 28; Arb. Tr. May 19, 2017, at 74-76.

26.     Immediately after their interaction in the building lobby, Mr. Motta reported to Citi's HR department that Claimant's conduct towards him was unwelcome and that he felt threatened by Claimant. *Id.*; Arb. Tr. May 19, 2017, at 75-76; Arb. Tr. Nov. 14, 2017, at 26. Mr. Motta reported that Claimant "started arguing with [Mr. Motta] about that client and then he was yelling at [Mr. Motta], pointing his finger on [sic] [Mr. Motta's] face, calling [him] names and threatening [him] to stop doing this again or [Mr. Motta] will see." Resps. Exs. 28 & 36.

27.     Citi investigated Mr. Motta's complaint about Claimant.  In view of the admitted subject matter of their confrontation, Citi credited Mr. Motta's version of events that the interaction had been "unwelcome" and that he felt "threatened."  Citi concluded that Claimant's conduct had

January 19, 2018
Page 11

again violated the Code and Citi's policies regarding respect in the workplace. [3] July 6, 2015 Final

Warning, Cl. Ex. 7; Arb. Tr. May 19, 2017, at 91.   In particular, Mr. Averett determined that

although there had been no physical contact between Mr. Motta and Claimant, the interaction was

serious, unwelcome, and wholly unnecessary. Arb. Tr. May 19, 2017, at 75-76.[4]

28.      Mr. Averett also noted that Mr. Motta had nothing to gain personally from his

complaint about Claimant and that the underlying issue had been resolved in Mr. Gherardi's favor.

He also testified that Mr. Motta had not in fact "poached" Mr. Xirau or behaved inappropriately

in any way.  Arb. Tr. May 19, 2017, at 59.

29.      After speaking with Claimant, Mr. Averett issued a Final Warning Letter dated June

25, 2015 and delivered to him on July 6, 2015. Cl. Ex. 7. The Warning Letter did not have any

economic ramifications, but reflected Mr. Averett's determination that Claimant's conduct

towards Mr. Motta was inappropriate. *Id.*

---

[3]  The interaction was captured by the lobby cameras which were reviewed by Mr. Averett and H.R.  The recording confirmed that there had not been any violence towards Mr. Motta or overtly aggressive behavior.  It also confirmed that the engagement had taken place and continued for a relatively lengthy time.  As a result, Mr. Averett decided to reject initial recommendations from H.R. representative Jessica Saragovi that Claimant be terminated and opted for a written warning.  Arb. Tr. Nov. 14, 2017, at 132. Mr. Averett emphasized the unwelcome and unnecessary nature of the interaction as opposed to its alleged "violence" noting that under the circumstances, Mr. Motta reasonably reported that he felt threatened. Arb. Tr. Nov. 14, 2017, at 26; Cl. Ex. 7.

[4]  In his closing, Claimant suggested that there should be a negative inference because Mr. Motta was not called.  That position is baseless.  Respondent did not believe that Mr. Motta would be a necessary witness in this hearing.  He was not involved in any of the decisions at issue.  His internal complaint simply precipitated an investigation the conclusions of which are in the record.  The decisonmakers here, Mr. Averett, Mr. Coscarelli (who appeared voluntarily) and Ms. Vasquez all testified as to the basis of their decision and those decisions are also described in great deal in the contemporaneous record.   Tellingly, Claimant, who demonstrated great facility in the "subpoena" process available to him in arbitration, calling several third party witnesses, also chose not to call Mr. Motta to examine him. *See Terry v. State*, 668 So. 2d 954, 963-64 (Fla. 1996) (stating that when uncalled witnesses "are equally available to both parties, no inference should be drawn or comments made on the failure of either party to call the witness") (quoting *State v. Michaels*, 454 So. 2d 560, 562 (Fla. 1984)).

January 19, 2018
Page 12

30.    In the June 25th Warning Letter, Mr. Averett also reminded Claimant that going forward he was expected to display professional conduct towards all of his colleagues and to address any concerns about his colleagues with his managers and under no circumstances, directly with those colleagues. *Id.* He offered to provide ongoing coaching and support but noted that further occurrences of such conduct would result in "immediate termination of employment." *Id.*

31.    Claimant did not take responsibility for his actions, and instead continued to contend that he had not done anything wrong in confronting Mr. Motta directly in the lobby. Despite the finding that Motta had not engaged in wrongful action, he also noted that he had continuing concerns that Mr. Motta would continue to try to "poach" customers from him. Dispute Resolution Request Form – Step 1, Cl. Ex. 9; Gherardi Step 2 Appeal, Cl. Ex. 18, at GHERARDI 0847-48.  He told Mr. Averett that he had "every right to personally engage with any of his co-workers."  Cl. Ex. 18, at GHERARDI 0846, 0847-48.  He continues to hold that position to this day and still does not accept that it was wrong of him to confront Mr. Motta and that Mr. Motta felt threatened by him. Arb. Tr. May 18, 2017, at 137-39.

32.    Claimant formally appealed the warning letter utilizing Citi's internal Dispute Resolution Process ("DRP"). Cl. Ex. 9.  In his Appeal he reiterated the same positions he had told Mr. Averett orally, including his view that he had done nothing wrong by personally confronting Mr. Motta over his view that Mr. Motta was engaging in "poaching" and warning Mr. Motta that he should not engage in any such conduct going forward. *Id.*

33.    Under Step 1 of the DRP the review was considered by Mr. Averett and the Firm's human resources department.  Ultimately, the appeal was denied, and the warning letter was upheld

January 19, 2018
Page 13

and left in place. Cl. Ex. 11.  In denying the appeal, Mr. Averett considered that Claimant had not

raised any new issues in his appeal.  To the contrary, in his Appeal Claimant confirmed that he

had made the choice to confront Mr. Motta regarding the already resolved matter; that he continued

to falsely believe that Mr. Motta had attempted to "poach" Mr. Xirau, and that his only purpose in

confronting Mr. Motta in the lobby was to warn him against engaging in similar conduct in the

future. Cl. Ex. 9.

34.     Mr. Averett testified that he had no issues with Claimant's decision to appeal the

final warning and that during the appeal process, they continued to work well together on a friendly

basis. Arb. Tr. May 19, 2017, at 111. After receiving the decision, Claimant remained unaccepting

of the determination and filed a new appeal under step 2 of the DRP.  Cl. Ex. 18. During the appeal

time frame, Mr. Averett's support for Claimant was reflected in a special speaking engagement

and other internal recognitions.  Draft Announcement, Cl. Ex. 15; Arb. Tr. May 15, 2017, at 181;

Arb. Tr. May 18, 2017, at 167-70.

35.     Pursuant to the DRP, the Step 2 Appeal was forwarded to the head of Citigold

International, Marcelo Coscarelli for review on or about October 12, 2015. Arb. Tr. Nov. 16, 2017,

at 24; Cl. Ex. 18. At the time, Mr. Coscarelli was the International Private Banking ("IPB")

business head. Arb. Tr. May 18, 2017, at 261. He has since left Citi and is now with EFG Capital,

an entity belonging to EFG International, which is a Swiss bank with a U.S. presence as a broker-

dealer in asset management and investment industrial advising. Arb. Tr. Nov. 16, 2017, at 14-15.

He is responsible for Latin American business and is the CEO for the broker-dealer in the U.S. *Id.*

at 15.

January 19, 2018
Page 14

36.     This was a very busy period for Citi, and in particular, Mr. Coscarelli and Mr. Averett. Arb. Tr. May 19, 2017, at 113. Citi was under high regulatory scrutiny by the U.S. Office of the Comptroller of the Currency ("OCC") to reformulate its anti-money laundering process ("AML"), which up to that point had been viewed as disjointed and inconsistent. *Id.* at 114. On October 2, 2015, the OCC instituted a moratorium whereby Citi could not open accounts for any new clients until it successfully redeveloped and implemented its AML. *Id.* Mr. Averett testified that during this period, he "was working 18 hours a day, seven days a week for a month" and that it "was the most intense professional experience" that he had up to that point. Arb. Tr. May 19, 2017, at 113-14.  Mr. Coscarelli testified that he traveled nearly weekly to New York and that his focus shifted from managing the business to dealing with the regulatory issues. Arb. Tr. Nov. 16, 2017, at 22.

37.     The "moratorium" enhanced the value to Citi of FA's like Claimant, who were successful and had strong compliance records.  Arb. Tr. May 19, 2017, at 116.[5]

38.     Before Mr. Coscarelli was able to take any material action on the Step 2 Appeal, he learned that Claimant had become involved in a similar incident with a different FA, Jorge Menendez. Arb. Tr. Nov. 16, 2017, at 61.

---

[5]     In his SOC and at hearing, Claimant variously argued that Mr. Averett and Citi were motivated to terminate him because he was less valuable as a result of the "moratorium."  That position was unsupported at hearing and the actual evidence showed the opposite to be the case.  Claimant was ultimately terminated by Citi even though his departure would be disruptive and have immediate negative economic and operational effects on the business.  Arb. Tr. May 19, 2017, at 116.

January 19, 2018
Page 15

39.     On October 23, 2015 Mr. Gherardi apparently learned that one of his clients, Jose

Ludgerio Freites, had opened an account at Citi's Doral Branch.

40.     Once again, Claimant took matters into his own hands and instead of going to his

manager as directed, called Mr. Freites while he was still at the Doral Branch.  Arb. Tr. May 18,

2017, at 177. Resps. Ex. 48; Arb. Tr. Nov. 15, 2017, at 129-35.  After a heated conversation with

Mr. Freites and another Citi employee, Javier Mondragon, Claimant spoke directly with Mr.

Menendez. Arb. Tr. Nov. 15, 2017, at 129-30. During that call Claimant berated Mr. Menendez

for opening a new account, exclaiming, "I don't know who you think you are. This is my client.

What do you think you're doing?" Arb. Tr. Nov. 15, 2017, at 130.

41.     Prior to speaking on the phone with Claimant, Mr. Menendez, who had worked at

Citi for a short term and reported to different managers in a different business unit, did not know

Claimant or even know who he was.  Arb. Tr. Nov. 15, 2017, at 130, 137.[6] Id. at 128-139.

42.     After his short phone interaction with Mr. Menendez, Claimant nearly immediately

sent an e-mail to Mr. Menendez accusing him again of "unethical conduct." Resps. Ex. 48.  He

closed the email by stating, "Please close the brokerage account he has with you and DO NOT

solicit the clients that I manage." Id. (emphasis in original). Claimant sent the email to Mr.

Menendez, Menendez's supervisor, and others at Citi. Id.

---

[6] In his closing, Claimant's counsel unfairly attacked Mr. Menendez' credibility as a witness.  Mr. Menendez is an FA whose involvement in this matter spanned the course of a few hours several years ago.  He testified voluntarily and credibly as to his recollections of that interaction.   The contemporaneous record fully supports the accuracy of his testimony and the attack on him was unwarranted.   It is also worth noting that after this arbitration was filed, Mr. Gherardi contacted Mr. Menendez in 2016 to apologize for what had happened and to ask Mr. Menendez to lunch. Arb. Tr. Nov. 15, 2017, at 139. Mr. Menendez declined. Id.

January 19, 2018
Page 16

43. The October 23, 2015 e-mail exchange was forwarded to Michael Averett that same day, and then to Mr. Coscarelli and Ms. Vasquez on October 28, 2015.  Email Chain, Resps. Ex. 32. Mr. Averett testified that this latest phone altercation and email were deeply disturbing because there "appeared to be a violation of a final warning that was very fresh in everyone's memory at that point." Arb. Tr. May 19, 2017, at 123-24.

44.     Upon review of this latest situation, Mr. Coscarelli and Ms. Vasquez decided that a formal disciplinary committee should be convened to objectively determine how Citi should respond to Claimant's actions. Arb. Tr. May 19, 2017, at 124; Arb. Tr. Nov. 14, 2017, at 225-26; Arb. Tr. Nov. 15, 2017, at 11-12; Arb. Tr. Nov. 16, 2017, at 60-63.

45.     The disciplinary committee was comprised of Carlos Gonzalez-Stawinski, Maria Vasquez, Antonio Guerrero, and Marcelo Coscarelli. Arb. Tr. Nov. 14, 2017, at 230. Ms. Vasquez informed the committee about the incident with Mr. Motta and the subsequent 2015 Final Warning, as well as Claimant's telephonic and e-mail confrontation of Mr. Menendez while the Final Warning was still in place.[7]

---

[7] Ms. Vasquez also listed other concerns as data points for the committee: (1) the 2010 confrontation with another FA that led to the 2010 Corrective Action Warning, (2) a non-work-related confrontation that Gherardi had with another Citi employee on an airplane on the way to Brazil in February 2015, (3) rumors that were circulating around the office about Claimant's alleged involvement in a domestic violence incident, and (4) concerns from other employees that Claimant carried a gun. Arb. Tr. Nov. 14, 2017, at 67-68; 167-170; Arb. Tr. Nov. 15, 2017, at 8-12, 60, 116, 178-79. These points were raised by Ms. Vasquez merely to provide background and context to the committee as they deliberated on the most recent confrontation, but the committee decided that the rumors about alleged domestic violence were not work-related or corroborated, and thus should not be considered at all in reaching an ultimate decision.  Arb. Tr. Nov. 15, 2017, at 8-12.

January 19, 2018
Page 17

46.     In addition, Ms. Vasquez relayed an incident she had learned of regarding Claimant's behavior on a February 2015 flight from Puerto Rico as a data point to the disciplinary committee. Arb. Tr. Nov. 14, 2017, at 167-169; Arb. Tr. Nov. 15, 2017, at 10-11.

47.     Claimant elaborated on that February incident during his rebuttal testimony, stating that while he and his "lady friend" were on "a vacation together to Puerto Rico," Claimant had "a very civil conversation" with his "lady friend's" ex-boyfriend (a Citi employee in Puerto Rico) about a rumor that the ex-boyfriend allegedly started about her having been a prostitute in Cuba. *Id.* In contrast, Ms. Vasquez testified that she informed the committee of what she had learned from the Puerto Rico Citi HR officer: that Claimant had approached the Citi employee on the plane in "an unwelcomed and disrespectful manner," the Citi employee "felt intimidated," and the steward "noticed the incident and had offered some assistance." Arb. Tr. Nov. 15, 2017, at 60, 117-20.

48.     Upon review of all the available facts, the disciplinary committee recommended unanimously that despite Claimant's high level of production and the likely disruption to its business, Mr. Gherardi simply could no longer represent Citi. Arb. Tr. May 19, 2017, at 141; Arb. Tr. Nov. 16, 2017, at 52-53. Mr. Coscarelli and Mr. Averett ultimately agreed with the recommendation. Arb. Tr. Nov. 14, 2017, at 101; Arb. Tr. Nov. 16, 2017, at 49-50.[8]

49.     Given the decision, Mr. Coscarelli determined to finish his Step 2 investigation prior to instituting the termination. Arb. Tr. Nov. 16, 2017, at 44-45.  On November 25, 2015, he

---

[8] Mr. Averett was not a formal member of the Disciplinary Committee.

January 19, 2018
Page 18

informed Claimant that he had upheld the original decision by Mr. Averett.  Arb. Tr. Nov. 16,

2017, at 44-45; Denial of Step 2 Appeal, Cl. Ex. 22.

50.    Because of some scheduling conflicts and a desire to communicate the decision in

person, Claimant was notified by Mr. Averett of his termination on December 11, 2015.  Arb. Tr.

Nov. 15, 2017, at 31.; Email Chain, Resps. Ex. 43.  He was paid in full for all commissions earned

under Citi's Variable Compensation Plan ("VCP") through December 11, 2015, even though

Claimant was not eligible under the terms of the VCP to receive payment for the fourth quarter of

2015 or December 2015 because he did not work 10 consecutive business days that month and

was not an active employee on the last business day. Resps. Ex. 44, at R001303-04; Resps. Ex. 45;

Arb. Tr. May 18, 2017, at 199; Arb. Tr. May 19, 2017, at 219-20, 254; Arb. Tr. Nov. 15, 2017, at

31. The VCP is a commission plan under which awards are discretionary. VCP, Resps. Ex. 44, at

R001301; Arb. Tr. Nov. 15, 2017, at 26.

51.    As a result of his termination, Claimant ceased to be a participant in the Financial

Advisor Deferred Compensation Plan ("FADP") - a legacy plan stemming from his initial

employment with predecessor Firm, Smith Barney. FADP Brochure, Resps. Ex. 46; Arb. Tr. Nov.

15, 2017, at 32-33.   Under the terms of the FADP, awards vest after eight years, subject to

continuous employment. Resps. Ex. 46; Arb. Tr. Nov. 15, 2017, at 39, 53-54.  At the time of his

termination in December 2015, Claimant's award granted to him in January 2008 in the amount

of $70,286.46, which was scheduled to vest in January 2016, was cancelled pursuant to the

unambigious terms of the Plan. FADP Summary, Cl. Ex. 31, at GHERARDI 2076; Arb. Tr. Nov.

15, 2017, at 38-39.

January 19, 2018
Page 19

52.     Claimant did not present any evidence to suggest that any of the Citi decision makers were aware of his participation in the FADP, let alone that his participation or the scheduled January 2016 vesting date for the approximately $70,000 influenced their decision to terminate his employment in December, 2015.[9]

53.     After Claimant's termination, Mr. Averett redistributed the accounts of the Citi customers Claimant had worked with per Citi's redistribution policies and procedures. Arb. Tr. May 19, 2017, at 53-54, 151.  None of the accounts were distributed to Mr. Motta despite his Portuguese language skills. Arb. Tr. May 19, 2017, at 153. As Portuguese language skills were however, at a premium, some accounts went to a new FA, Patrick Rabenau who was proficient in that language. Arb. Tr. May 19, 2017, at 154-55.[10]

54.     After his departure, neither Mr. Averett nor Citi actively sought to prevent Claimant from obtaining new employment.  To the contrary, at his request, Citi provided him with valuable information about his accounts and record to assist him in finding a new job. Arb. Tr. May 18, 2017, at 195-197; Cl. Ex. 35.

---

[9]  In the SOC, Claimant contends that the FADP was worth $400,000. That is misleading as Claimant's grants from 2009 and 2010 were not scheduled to vest until 2017 and 2018 respectively. Cl. Ex. 31.

[10] In the SOC and at hearing, Claimant stated and implied that Mr. Averett was somehow motivated to terminate him so that he could assign accounts to Mr. Rabenau, purportedly because they are friends.   In making that baseless allegation he also impugned the competency of Mr. Rabenau at various points.  SOC at 8; Arb. Tr. May 16, 2017, at 152-55.  As demonstrated through the evidence presented at hearing, Mr. Averett was not the sole or ultimate decision maker with regard to Claimant's termination but simply one of several involved in that decision. Arb. Tr. May 19, 2017, at 154-55.  Nevertheless, no evidence was produced that would suggest that Mr. Averett was motivated in any of his acts by a desire to favor Mr. Rabenau. Mr. Rabenau was assigned accounts because of business needs and his ability to speak Portuguese. *Id.* The false allegations about Mr. Averett and Mr. Rabenau were speculative and unfair and again demonstrate Claimant's utter lack of credibility.

January 19, 2018
Page 20

55.     In accordance with FINRA rules and regulations, Citi's Registration Department completed a Form U-5 with a true and accurate explanation of the reason for Claimant's termination based on the facts.  Form U-5, Cl. Ex. 26; Arb. Tr. May 19, 2017, at 164.

56.     Claimant's Form U-5 lists as the reason for his termination: "Business decorum issues, non-investment related conduct." Form U-5, Cl. Ex. 26; Arb. Tr. May 19, 2017, at 164.

57.     Claimant has admitted that the language is factually accurate and cannot articulate alternative language that would be accurate. Arb. Tr. May 18, 2017, at 213-14.

58.     To the extent Claimant's efforts to obtain employment after his termination were unsuccessful, the evidence presented by Claimant and the third party witnesses he called at hearing, made clear that those employers were concerned with the language on his CRD reflecting his arrest for striking a police officer and that the language on his Form U-5 was not the basis for any decisions not to offer him employment. [11]

59.     Approximately three months after his employment ended, Claimant obtained a comparable position with Bulltick, LLC where he works today. Arb. Tr. May 16, 2017, at 42-43, 99, 240-41.  He earned approximately $258,150.00 in 2016. W-2s, Cl. Ex. 21.

---

[11] In his SOC, Claimant suggested that Citi may have been motivated to terminate him because they were aware he had been speaking with other employers, including Morgan Stanley and that especially in light of the moratorium were worried that he would leave voluntarily and take business with him.  Aside from that theory being illogical and speculative, there was no evidence presented to support it.  The evidence was clear that Claimant did not have any open offers of employment from Morgan Stanley, UBS or any other organization and that Citi was not focused at all on his departure.  Arb. Tr. May 17, 2017, at 82, 103.  Citi took steps to retain valuable employees in general, but there was no evidence that any of those steps, including general succession planning, were targeted towards Claimant.  Arb. Tr. May 19, 2017, at 224.

January 19, 2018
Page 21

### III.   ARGUMENT

The evidence presented at the hearing establishes that Citi acted reasonably and appropriately at all times in addressing Claimant's unprofessional conduct, terminating his employment based on that conduct, and truthfully reporting the reason for his termination as FINRA requires.  Mr. Averett also acted appropriately in redistributing the Citi customer accounts Claimant had worked with per Citi's redistribution policies and procedures.  As such, Claimant's claims lack legal and factual merit and should be denied in their entirety.

### A.   Claimant was an At-Will Employee, and thus, he has no Claim for Wrongful Termination, Breach of Contract, or Promissory Estoppel.

Contrary to Claimant's assertions that a "just cause" standard applies to his termination, he was an at-will employee of Citi.  As a result, his employment could be terminated at any time with or without cause and with or without notice.   It is well-established precedent in Florida that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be hiring at will and terminable at any time by either party.  *Bryant v. Shands Teaching Hosp. & Clinics, Inc.*, 479 So. 2d 165, 167-68 (Fla. Dist. Ct. App. 1st 1985) (citing *Ponton v. Scarfone*, 468 So. 2d 1009 (Fla. Dist. Ct. App. 2d 1985)).  In fact, under this doctrine Florida courts routinely reject wrongful termination claims based on an employer's alleged "bad motives" in terminating an employee.  *Id.*  Florida law dictates that only employees with employment contracts for a definite term can claim breach of contract, and logically, at-will employees with no definite term of employment cannot claim breach of contract.  *Yarcheski v. Keiser School, Inc.*, 508 Fed.Appx. 916, 917 (11th Cir. 2013) (citing *Smith v. Piezo Tech. & Professional Adm'rs*, 427 So. 2d 182, 184 (Fla. 1983)).

January 19, 2018
Page 22

In a misguided attempt to avoid the plain and express terms of the Handbook and the Code that governed his employment and decades of precedent, Claimant argues that as a result of his signature on a Form U-4 and his agreement to submit any dispute or claim in connection with his employment with Citi to arbitration pursuant to FINRA's Rules, an implied term arises in his employment agreement, by which, Claimant contends, Citi could only terminate his employment for "just cause."  Claimant has cited no legal support for this novel argument, and that is because his claim that the existence of an arbitration provision injected a "just cause" standard into his employment arrangement has been routinely and squarely rejected.  *See e.g.*, *Bevis v. PaineWebber, Inc.*, NASD Docket No. 97-03381, 1999 WL 1146790, at *4-5 (N.A.S.D. Aug. 12, 1999), (rejecting argument that a registered representative's employment could not be terminated absent "just cause" based simply upon his execution of the Form U-4 as a matter of law because, as here, the employee was hired on an "at-will" basis pursuant to the terms of the employer's written policies and procedures, none of which provided for termination for "just cause.")

It has long been recognized that arbitration provisions are simply forum selection clauses, and thus, have no bearing on the parties' substantive rights.  Indeed, the Supreme Court held long ago that an "agreement to arbitrate … is, in effect, a specialized kind of forum selection clause that posits not only the situs of suit, but also the procedure to be used in resolving the dispute."  *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519 (1974).  In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), a seminal case concerning employment arbitration, the Supreme Court reaffirmed this principle and held specifically that compulsory agreements to arbitrate are merely waivers of the judicial forum and do not in any way alter the substantive rights of the parties to those agreements.  *Id.* at 29; *see also EEOC v. Waffle House, Inc.*, 534 U.S. 279, 295 n.10 (2002)

January 19, 2018
Page 23

(recognizing that since arbitration agreements only determine the choice of forum, by agreeing to arbitrate, *"a party does not forgo [its] substantive rights . . .*; it only submits to their resolution in an arbitral, rather than a judicial, forum") (emphasis added) (citation omitted).[12]

Citi's Arbitration Policy that requires Claimant to submit his claims to arbitration, clearly states, "Employment with Citi is a voluntary relationship for no definite period of time, and nothing in this Policy or any other Citi document constitutes an express or implied contract of employment for any definite period of time.  This Policy doesn't constitute, nor should it be construed to constitute, a waiver by Citi of its rights under the 'employment at-will' doctrine nor does it afford an employee or former employee any rights or remedies not otherwise available under applicable law."  Resps. Ex. 2, at R000140.  Claimant's at-will status is reiterated in the Code and Handbook. Resps. Ex. 4, at R000176; Resps. Ex. 2, at R000085, R000135.

Perhaps recognizing the lack of support for his "just cause" argument, Claimant also claims that Citi breached a "contract" with him.  Although the SOC is vague on this point, to the extent Claimant is contending that the anti-retaliation provision of Citi's DRP is the "contract" at issue is a contract, such an argument would be meritless.  Initially, the DRP itself affirms Claimant's at-will status, but most significantly, Claimant was not terminated in retaliation for using the DRP

---

[12] To the extent that Claimant were to cite the decision of the Eighth Circuit in *PaineWebber, Inc. v. Agron*, 49 F.3d 347 (8th Cir. 1995) to support his claim, that case, in addition to being inapplicable as precedent here is inapposite. *Agron* involved a situation where the employment relationship was silent as to whether it was at-will.  The Court did not simply ignore written communications explicitly stating the employment relationship was at-will as Claimant appears to suggest it do here.  While multiple cases have recognized the at-will doctrine even in the face of agreements to arbitrate, *Agron* has never been cited by a court in Florida as precedent in the twenty-one years since it was decided.

January 19, 2018
Page 24

process.  He was terminated only after yet another documented incident of inappropriate communications with a colleague.

For the same reason, Claimants' claim of promissory estoppel on the premise that his termination was in retaliation for using the DRP process and in contravention of the DRP's anti-retaliation provision, is also baseless.  To establish promissory estoppel, Claimant would have to prove: (1) a representation as to a material fact that is contrary to a later-asserted position; (2) a reasonable reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel caused by the representation and reliance thereon.  *FCCI Ins. Co. v. Cayce's Excavation, Inc.*, 901 So. 2d 248, 251 (Fla. Dist. Ct. App. 2d 2005).  Here, again Claimant cannot demonstrate that his termination had any connection to his utilization of the DRP Program, and accordingly, his promissory estoppel claim simply cannot stand.

### B.    Claimant Has Not Been Defamed by the Statement on his Form U-5.

In industry disputes like this, FINRA requires that expungement of a Form U-5 only occur when the arbitrators have determined that the information sought to be expunged "is defamatory in nature."  *The Arbitrator's Guide*, October 2015 at p. 74.  There are no defamatory statements on Claimant's Form U-5 and no other basis to modify the truthful statements contained therein.  Accordingly, his request for expungement should be denied.

#### 1.    The Form U-5 Statement is True.

Far from being defamatory, Claimant's Form U-5 is entirely accurate.  The evidence establishes that Claimant was terminated because of his lack of business decorum.  Indeed, that

January 19, 2018
Page 25

description is, if anything, a generous description of Claimant's conduct.  Because the statement

is true, it is not defamatory and must not be expunged.  *Klayman v. Judicial Watch, Inc*., 22

F.Supp.3d 1240, 1250 (S.D. Fla. May 23, 2014) (citations omitted) (holding that one must prove

publication of a false statement to prove defamation).  Truth is an affirmative defense to a

defamation action because, quite simply, there can be no false statement under those

circumstances.  *Id*. at 1253-54.  Moreover, per Florida's substantial truth doctrine, a statement does

not have to be perfectly accurate as long as the "gist" of the statement is true.  *Id*.

### 2.      *The Form U-5 Statement Is Protected By A Qualified Privilege.*

Since the statement on his U-5 is entirely accurate, that alone can be determinative of his

defamation/expungement claim.  However, it is also worth noting that in Florida, potentially

defamatory statements on a Form U-5 are also subject to a qualified privilege.  *Eaton Vance*

*Distributors, Inc. v. Ulrich*, 692 So. 2d 915, 916 (Fla. Dist. Ct. App. 2d 1997).  "Under Florida

law, a 'presumption of good faith' attaches to a statement made in accordance with a qualified

privilege."  *Smith-Johnson v. Thrivent Financial for Lutherans*, No. 803CV2551T30EAJ, 2005

WL 1705471, at *6 (M.D. Fla. July 20, 2005) (quoting *Nodar v. Galbreath*, 462 So. 2d 803, 810

(Fla. 1984)).  In order to overcome Citi's qualified privilege, Claimant had to prove that the

statement was made with "express malice," which required him to show that the *primary motive*

for making the statement was an intent to injure him.  *Nodar*, 462 So. 2d at 806.  Thus, where a

party acts to protect a proper interest and the alleged defamer "is motivated by a desire to protect

that interest, he does not forfeit the privilege merely because he also in fact feels hostility or ill

will toward the plaintiff."  *Id.* at 811-12.

January 19, 2018
Page 26

Citi was obligated to provide timely, complete, and accurate information on Claimant's Form U-5. Article V, Section 3(a) of FINRA's By-Laws requires all member firms to file an accurate Form U-5 when a registered representative's association with the firm ends. Moreover, FINRA Regulatory Notice 10-39 (September 2010) reminds employers like Citi of the need to file timely, complete, and accurate information on a Form U-5. As stated in that Notice, "It is imperative that firms file complete and accurate Forms U-5 in a timely manner." It also explains:

> [A] firm must provide sufficient detail when responding to Form U-5 questions such that a reasonable person may understand the circumstances that triggered the affirmative response. For example . . . it is not sufficient for a firm to report only that a person's registration was terminated because that person violated firm policy. If a firm is obligated to report that a registered person was terminated because he or she violated a firm policy, the firm must identify the policy [and] provide sufficient facts and circumstances to enable the reader to understand what conduct was involved.

Citi, like all registered firms, is subject to administrative and civil penalties for failing to provide complete and accurate information on the Form U-5. *Id*.

The reason provided for Claimant's termination on his Form U-5 is complete, truthful, and stated in relatively neutral terms. There is absolutely no evidence that even suggests the decision-makers here had any intent to harm Claimant by complying with their regulatory responsibilities.

In every step of the termination process Citi fulfilled its legal obligations. Citi published the statement for no other reason than to fulfill its obligation under FINRA rules. Even if Claimant had adduced some evidence of corporate animus against him – which he did not – it would not defeat Citi's privilege. As such, Claimant's Form U-5 should not be expunged.

January 19, 2018
Page 27

> **C.    Claimant's Tortious Interference with Prospective Economic Relations and Contractual Relations Claims Should be Dismissed Without Further Consideration.**

Claimant's tortious interference with prospective economic relations and contractual relations claims do nothing more than reiterate his defamation claim. Not only are these claims duplicative of his meritless defamation claim, they are just as factually and legally baseless.

Claimant's claim for tortious interference with an advantageous business relationship also cannot succeed because Claimant could not establish the essential elements of that claim. Under Florida law, these include: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the business relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *Maxi-Taxi of Fla., Inc. v. Lee County Port Authority*, 310 Fed. Appx. 881, 885 (11th Cir. Dec. 8, 2008). Furthermore, proof of intent is essential, as there can be no "cause of action for interference which is only negligently or consequentially effected." *Id*. at 885-86.

Initially, Claimant's tortious interference claim cannot stand because it is contrary to Florida's "single action rule." Under that concept, a single publication gives rise to a single cause of action so that a plaintiff cannot circumvent a valid defense to defamation by using the same facts to assert several causes of action. That is precisely what Claimant has attempted here. *Klayman*, 22 F.Supp. 3d at 1256-57 (citations and quotations omitted). Since Claimant's defamation expungement claim fails because the Form U-5 statement is true and protected by a

January 19, 2018
Page 28

qualified privilege, Claimant cannot use the same Form U-5 statement as the basis for his tortious interference with prospective economic relations claim.

However, even if Florida did not apply the single action rule, Claimant still could not prevail on a tortious interference claim because there can be no unjustified interference when a party acts per statutory or contractual authority. *Maxi-Taxi of Fla., Inc. v. Lee County Port Authority*, No. 2:07-cv-82-FtM-34SPC, 2008 WL 1925088, at *17 (M.D. Fla. April 29, 2008) (citations and quotations omitted). Again, Citi included the reason for Claimant's termination on his Form U-5 per its obligation to do so per FINRA's By-Laws, Rules, and Regulations. There can be no unjustified interference when Citi acted in accordance with FINRA's regulatory authority.

Claimant also alleged a baseless claim of tortious interference with contractual relations against Mr. Averett for redistributing the customer accounts that Claimant had worked with per Citi's policies and procedures. Naturally, after Claimant's termination, Mr. Averett had an obligation to redistribute the accounts of the Citi customers Claimant had worked with per Citi's redistribution policies and procedures. Claimant's conclusory allegations notwithstanding, the business relationships with the clients referenced in connection with this claim were Citi's, not Claimant's. These clients were not obligated to engage in any business with Claimant, nor was there any direct contractual relationship between Claimant and the clients. The lack of a legally enforceable obligation between Claimant and Citi's clients precludes Claimant's tortious interference claim. *See Dwight v. Tobin*. 947 F.2d 455, 460 (11th Cir. 1991) (without legally

January 19, 2018
Page 29

enforceable agreement with which defendant has interfered, there is no business relationship for a tortious interference claim).

Moreover, Claimant could not establish that the alleged interference was unjustified. "For interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." *W.D. Sales & Brokerage, LLC v. Barnhill's Buffet of Tenn., Inc.*, 362 Fed. Appx. 142, 143 (11th Cir. Jan. 22, 2010). Here Citi had a legal obligation to make sure customer's accounts were properly serviced after Claimant's departure. Claimant has thus failed to establish essential elements of the claim for tortious interference against Mr. Averett, and it should therefore be dismissed.

Finally, Claimant requested a declaration that the non-solicitation provision of Citi's handbook be held unenforceable against him. However, Claimant has presented no evidence of interference with his efforts to obtain employment because there are none. Citi has taken no measures to stop Claimant from working at Bulltick and competing with Citi. Indeed, Claimant works there today and is servicing clients whom he serviced while at Citi. Notably, the non-solicitation period in Citi's handbook as applicable to Claimant has expired. As such, his legally unsupportable request is unnecessary and should be dismissed.

January 19, 2018
Page 30

## <u>CONCLUSION</u>

For the foregoing reasons, Claimant's claims should be dismissed in their entirety and

Claimant's demand for payment rejected. Respondents respectfully request that the Panel award

any and all relief to Respondents that this Panel deems appropriate.

Dated: January 19, 2018                              Respectfully submitted,

                                                     MORGAN, LEWIS & BOCKIUS LLP


                                                     By: */s/ Ira G. Rosenstein*
                                                     Ira G. Rosenstein
                                                     101 Park Avenue
                                                     New York, New York 10178
                                                     Tel. 212-309-6000
                                                     Fax. 212-309-6001

cc:     Dalisi O. Carrasco, Esq.
        Ethan A. Brecher, Esq.

DB1/ 95271282.1